**FEDERAL TRADE COMMISSION,**
**Plaintiff–Appellee,**

v.

**AFFORDABLE MEDIA,**
**LLC, Defendant,**

and

**Denyse Lindaalyce Anderson; Michael**
**K. Anderson, Defendants–**
**Appellants.**

No. 98–16378.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 13, 1999.

Decided June 15, 1999.

Pamela J. Naughton and Michael P. McCloskey, Baker & McKenzie, San Diego, California, for the defendants-appellants.

Michael S. Fried, Federal Trade Commission, Washington, D.C., for the plaintiff-appellee.

Before: WIGGINS, TASHIMA, and SILVERMAN, Circuit Judges.

WIGGINS, Circuit Judge:

A husband and wife, Denyse and Michael Anderson, were involved in a telemarketing venture that offered investors the chance to participate in a project that sold such modern marvels as talking pet tags and water-filled barbells by means of late-night television. Although the promoters promised that an investment in the project would return 50 per cent in a mere 60 to 90 days, the venture in fact was a Ponzi scheme, which eventually unraveled and left thousands of investors with tremendous losses. When the Federal Trade Commission brought a complaint against the telemarketing duo, they claimed that they were simply innocent dupes rather than a modern day telephonic Bonnie and Clyde.

While the investors' money was lost in the fraudulent scheme, the Andersons' profits from their commissions remained safely tucked away across the sea in a Cook Islands trust. When the Commission brought a civil action to recover as much money as possible for the defrauded investors, the Andersons advanced two incredible propositions. First, they claimed that they should retain the 45 percent commissions they received for their role in the fraud, even though they acknowledged that the investors were defrauded. They claimed this entitlement because they merely sold the toxic investments that fueled the scheme and propped up the duplicitous house of cards. Second, the Andersons claimed that they were unable to repatriate the assets in the Cook Islands trust because they had willingly relinquished all control over the millions of dollars of commissions in order to place this money overseas in the benevolent hands of unaccountable overseers, just on the off chance that a law suit might result from their business activities. The learned district court was skeptical of both arguments and choose to grant the Commission its requested preliminary relief.

■ An old adage warns that a fool and his money are easily parted. This case shows that the same is not true of a district court judge and his common sense. After the Andersons refused to comply with the preliminary injunction by refusing to return their illicit proceeds, the district court found the Andersons in civil contempt of court. The Andersons appealed. We have jurisdiction under 28 U.S.C. § 1292(a)(1) and we affirm.[1]

I

Sometime after April 1997, Denyse and Michael Anderson became involved with The Sterling Group ("Sterling"). Sterling sold such imaginative products as the "Aquabell," a water-filled dumbbell, the "Talking Pet Tag," and a plastic wrap dispenser known as "KenKut" by means of late-night television commercials broadcast between the hours of 11:00 p.m. and 4:00 a.m. The Andersons formed Financial Growth Consultants, LLC ("Financial") to serve as the primary telemarketer of media units, an investment that afforded purchasers the opportunity to receive a portion of the profits generated from the sales of Sterling's outlandish products. Financial's telemarketers thereupon set about locating prospective investors in the media unit scheme.

The media units sold for $5,000. Each media unit entitled the investor to participate in the sale of Sterling's products from 201 of the late-night commercials. Each

1. We also grant the Commission's motion to strike the materials contained in the first tab of Appellants' Supplemental Excerpts of Record. These materials are declarations, executed in September 1998, months after the district court issued the preliminary injunction and found the Andersons in contempt of court. We, therefore, order these materials stricken. *See Kirshner v. Uniden Corp. of Am.,* 842 F.2d 1074, 1078 (9th Cir.1988) (striking portions of excerpts of record that were "neither filed with the district court, considered by the court, nor even before the court when it entered the order that [appellant] now challenges on appeal").

product sold for $20.00. The investor would receive $7.50 for each product sold during his 201 commercials, up to a maximum of five products per commercial. According to Financial's telemarketers, the investors would likely receive $37.50 per commercial (from five products sold during each commercial) for a total of $7,537.50–an astronomical fifty percent return in sixty to ninety days. Financial, for its part, would receive forty-five percent of the investor's $5,000.00 investment, an amount that the Andersons assert is the industry standard.

It appears that Financial's telemarketers were especially skilled at marketing the media units. Financial may have raised at least $13,000,000 from investors in the media-unit scheme, retaining an estimated $6,300,000 in commissions for itself. Perhaps unsurprisingly to those not involved in the media-unit project, it turned out that Sterling could not sell enough Talking Pet Tags and Aquabells to return the promised yields to the media-unit investors. Instead, it appears that Sterling used later investors' investments to pay the promised yields to earlier investors-a classic Ponzi scheme.

On April 23, 1998, the Federal Trade Commission (the "Commission") filed a complaint in the United States District Court for the District of Nevada, charging the Andersons, Financial, and others with violations of the Federal Trade Commission Act (the "Act") and the Telemarketing Sales Rule for their participation in a scheme to telemarket fraudulent investments to consumers. Upon motion by the Commission, the district court issued an *ex parte* temporary restraining order against the defendants.[2] After hearings on April 30 and May 8, 1998, the district court entered a preliminary injunction against the defendants, which incorporated the provisions of the temporary restraining order. Both the temporary restraining order and the preliminary injunction required the Andersons to repatriate any assets held for their benefit outside of the United States.

In July, 1995, the Andersons had created an irrevocable trust under the law of the Cook Islands. The Andersons were named as co-trustees of the trust, together with AsiaCiti Trust Limited ("AsiaCiti"), a company licensed to conduct trustee services under Cook Islands law. Apparently, the Andersons created the trust in an effort to protect their assets from business risks and liabilities by placing the assets beyond the jurisdiction of the United States courts. As discussed more fully below, the provisions of the trust were intended to frustrate the operation of domestic courts, by removing the Andersons as trustees and preventing AsiaCiti from repatriating any of the trust assets to the United States if a so-called "event of duress" occurred.

In response to the preliminary injunction, the Andersons faxed a letter to AsiaCiti on May 12, 1998, instructing AsiaCiti to provide an accounting of the assets held in the trust and to repatriate the assets to the United States to be held under the control of the district court. AsiaCiti thereupon notified the Andersons that the temporary restraining order was an event of duress under the trust, removed the Andersons as co-trustees under the trust because of the event of duress, and refused to provide an accounting or repatriation of the assets. The trust assets were therefore not repatriated to the United States and the Andersons have provided only lim-

---

2. The temporary restraining order prohibited the Andersons, the other defendants, and their agents from making false or misleading statements in connection with the marketing of investments or destroying or otherwise failing to maintain their business records. It also froze the defendants' assets and required the defendants to provide a financial statement to the Commission's counsel. In addition, it required any financial institutions in possession of the defendants' assets to preserve the assets and provide the Commission's counsel information about the assets. Finally, it required the defendants to repatriate all assets outside of the United States to the territory of the United States.

ited information to the district court and the Commission regarding the trust assets.

■ On May 7, 1998, the Commission moved the district court to find the Andersons in civil contempt for their failure to comply with the temporary restraining order's requirements that they submit an accounting of their foreign assets to the Commission and to repatriate all assets located abroad. At a hearing on June 4, 1998, the district court found the Andersons in civil contempt of court for failing to repatriate the trust assets to the United States and failing to provide an accounting of the trust's assets. The district court, however, continued the hearing until June 9, then until June 11, and finally until June 17, in an effort to allow the Andersons to purge themselves of their contempt. In attempting to purge themselves of their contempt, the Andersons attempted to appoint their children as trustees of the trust, but AsiaCiti removed them from acting as trustees because the event of duress was continuing. At the June 17 hearing, the district court indicated that it believed that the Andersons remained in control of the trust and rejected their assertion that compliance with the repatriation provisions of the trust was impossible. At the close of the June 17 hearing, the district judge ordered the Andersons taken into custody because they had not purged themselves of their contempt. The Andersons timely appealed the district court's issuance of the preliminary injunction and finding them in contempt. We affirm the district court.[3]

## II

■ The first issue in the Anderson's appeal concerns the district court's issuance of the preliminary injunction. This court only subjects a district court's order regarding preliminary injunctive relief to "limited review." *Does 1–5 v. Chandler,* 83 F.3d 1150, 1152 (9th Cir.1996). We will reverse a district court's issuance of a preliminary injunction only if the district court abused its discretion by basing its decision on an erroneous legal standard or on clearly erroneous factual findings. *See id.* Based on the record, we find that the district court did not abuse its discretion in issuing the preliminary injunction.

■ Section 13(b) of the Act allows a district court to grant the Commission a preliminary injunction "[u]pon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest." 15 U.S.C. § 53(b). Section 13(b), therefore, "places a lighter burden on the Commission than that imposed on private litigants by the traditional equity standard; the Commission need not show irreparable harm to obtain a preliminary injunction." *FTC v. Warner Communications, Inc.,* 742 F.2d 1156, 1159 (9th Cir.1984). Under this more lenient standard, "a court must 1) determine the likelihood that the Commission will ultimately succeed on the merits and 2) balance the equities." *Id.* at 1160.

### A. Likelihood of Success on the Merits

■ In its complaint, the Commission alleged that: (1) the Andersons and Financial violated Section 5(a) of the Act by representing that consumers were highly likely to earn returns of 25 percent or more on their investments within a period of 90 days even though these consumers were not likely to earn such returns; and (2) the Andersons and Financial violated Section 310.3 of the Telemarketing Sales Rule, 16 C.F.R. § 310.3(a)(2)(vi), by misrepresenting a material aspect of the investors' investment opportunity by misrepresenting the return the investors were likely to earn. In granting the prelimi-

---

**3.** Subsequent to the Andersons' appeal to this court, but prior to oral argument, the district court ordered the Andersons released from custody. In its Release Order, filed December 22, 1998, the district court ordered the Andersons released but found that they remain in contempt of court. Because they remain in contempt, their appeal of the court's order finding them in contempt has not been rendered moot, even though they are no longer in custody.

nary injunction, the district court found a "substantial likelihood that the Commission will ultimately succeed" in establishing that the Andersons and their company had violated these provisions and were likely to violate these provisions in the future. Preliminary Injunction, entered and served May 22, 1998, at 2. The Andersons do not deny that the Sterling enterprise was a Ponzi scheme. Instead, the Andersons challenge the district court's order by claiming that the Commission will not succeed in holding them personally liable for their involvement in the scheme. This contention lacks merit; the Commission has made a sufficient showing to justify preliminary injunctive relief.

The Andersons claim that the Commission will not succeed on the merits in holding them personally liable for restitution for any deceptive practices of Financial. Their contention reveals a crucial misunderstanding regarding the requisite factual showing in order to obtain preliminary, as compared to permanent, injunctive relief. Once the correct standard is applied, it becomes abundantly clear that the district court did not abuse its discretion in finding that the Commission had made a sufficient showing that it will likely succeed in holding the Andersons personally liable for Financial's misconduct.

■■ Individuals are personally liable for restitution for corporate misconduct if they "had knowledge that the corporation or one of its agents engaged in dishonest or fraudulent conduct, that the misrepresentations were the type upon which a reasonable and prudent person would rely, and that consumer injury resulted." *FTC v. Publishing Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir.1997). The knowledge requirement can be satisfied by showing that the individuals

had actual knowledge of material misrepresentations, [were] recklessly indifferent to the truth or falsity of a misrepresentation, or had an awareness of a high probability of fraud along with an intentional avoidance of the truth.

*Id.*[4] The Commission, however, "is not required to show that a defendant intended to defraud consumers in order to hold that individual personally liable." *Id.*

The Andersons concede that reckless indifference is legally sufficient to impose personal liability on principals for corporate wrongdoing. Instead of challenging the legal standard applied by the district court, they challenge the court's factual findings. In its preliminary injunction, the district court found "substantial evidence that [the Andersons] were at least recklessly indifferent to the deceptive profit representations of the telemarketers" who worked for Financial and its independent sales offices. Preliminary Injunction, entered and served May 22, 1998, at 2. The Andersons assert that the district court's "finding of reckless indifference is based on clearly erroneous findings of fact." Appellants' Opening Brief at 27. In making this assertion, the Andersons reveal a fundamental misunderstanding of the factual showing necessary to support a district court's preliminary injunction (as compared to a permanent injunction) as well as confusion regarding the appropriate legal standards for imposing personal liability on principals for corporate misconduct.

In reviewing a preliminary injunction, our review is significantly constrained because of the state of the record available for our review. This constraint is especially limiting when we are asked to review the district court's factual findings that serve as the basis for a preliminary injunc-

---

4. The Commission claims that knowledge or reckless indifference is not necessary for *disgorgement*, as compared to *restitution*. The Commission bases this claim upon cases dealing with the Commodity Futures Trading Commission. This argument has been proffered by the Commission before and this Circuit has declined to reach the issue. *See, e.g.,*

*FTC v. Pantron I Corporation*, 33 F.3d 1088, 1103 (9th Cir.1994). We will not decide today whether the Act allows the Commission to obtain disgorgement, without regard to the defendant's mental state, because we believe that the Commission has made a sufficient showing of reckless indifference to obtain preliminary injunctive relief.

tion. We have explained these limitations in another case in which we had to review a district court's issuance of a preliminary injunction:

> We begin by identifying how little we can assist in the final resolution of the critical issues before the district court. *Until a permanent injunction is granted or denied, we are foreclosed from fully reviewing the important questions presented.* . . . Review of factual findings at the preliminary injunction stage is, of course, restricted to the limited and often nontestimonial record available to the district court when it granted or denied the injunction motion. The district court's findings supporting its order granting or denying a permanent injunction may differ from its findings at the preliminary injunction stage because by then presentation of all the evidence has been completed. Then too, our determination whether its subsequent findings are clearly erroneous may differ from our view taken at the preliminary stage.

*Zepeda v. INS*, 753 F.2d 719, 723–724 (9th Cir.1985) (emphasis added). Recognizing the limitations we face, and applying the appropriately deferential level of scrutiny to the district court's findings, the Andersons' contentions can be dealt with without any difficulty.

The Andersons claim that the district court's finding of reckless indifference was clearly erroneous because they had conducted extensive due diligence before becoming involved with Sterling. The district court was skeptical of the Andersons' claim because extensive due diligence likely would have brought to light the

scheme's fraudulent nature.[5] More importantly, the Andersons' assertion evidences a clear misunderstanding of the relevant standard for personal liability on the part of corporate principals for corporate misconduct. The extent of an individual's involvement in a fraudulent scheme alone is sufficient to establish the requisite knowledge for personal restitutionary liability. *See FTC v. Sharp*, 782 F.Supp. 1445, 1450 (D.Nev.1991); *FTC v. Amy Travel Service, Inc.*, 875 F.2d 564, 574 (7th Cir.1989) ("Also, the degree of participation in business affairs is probative of knowledge.") The Andersons' control of Financial, the chief telemarketer of Sterling and the media units, establishes strong evidence of the Andersons' knowledge. *See Sharp*, 782 F.Supp. at 1450 ("Here, Hall was a principal in, and president of MEHA, the chief broker of White Rock mines. Hall was deeply involved in the marketing of White Rock for around two and a half years. Thus, there is strong evidence that Hall knew his representations were false.").

Even though the Andersons claim to have relied on their due diligence efforts, ample evidence, at least for preliminary injunctive relief, supports the district court's conclusion that in light of their central involvement in the media unit scheme the Andersons were at a minimum recklessly indifferent to the truth of the representations Financial was making regarding the profit potential of the media unit investments. *See id; see also Pantron I Corporation*, 33 F.3d at 1104 ("Given the overwhelming evidence that no scientific support existed for the product's efficacy claims, Lederman could not have

---

**5.** The district court found the Andersons' due diligence efforts to be extremely deficient. *See* Opinion and Order, entered and served May 22, 1998, at 2–3. The only reliable information concerning actual sales by Sterling was obtained five months after the Andersons began selling the media units for Sterling. Nor did the Andersons conduct continuing diligence efforts to ensure that the media units were profitable investments rather than the Ponzi scheme that they proved to be. *Id.* Although the Andersons emphasize what they

feel were adequate due diligence efforts, they fail to respond in any way to the specific deficiencies noted by the district court. Our review of the record indicates that there is more than sufficient evidence to support the district court's findings and nothing approaching what would be necessary for us to conclude that the district court's findings were clearly erroneous, given the level of deference afforded a district court's findings in connection with a preliminary injunction.

failed to know that the scientific support claims were false unless he intentionally avoided the truth.").

The district court found that the promised yields on the media unit investments were so extraordinary that the Andersons should have been suspicious of the investment scheme. The Andersons claim that the district court miscalculated the promised yield on the media units. Instead of the 1000% annualized yield that the district court found would be necessary to earn the promised returns to the investors, they claim that under a profit-margin per-item analysis, the media units only had to yield a more modest 50% return in 60 to 90 days in order to deliver the promised yields-an annualized return of 200% to 300%. The Andersons seem to believe that these more modest returns on the media unit investments were so reasonable that they were not required to conduct more extensive due diligence. Perhaps the Andersons' telemarketers were able to convince their victims that Sterling could sell enough water-filled barbells and talking pet name tags to deliver 50% returns on their investments in 60 to 90 days, but the Andersons have failed to convince us that the district court erred in finding that experienced business persons like the Andersons should have conducted greater due diligence efforts before representing to potential investors that the investment would yield 50% returns in a mere 60 to 90 days. Consequently, we cannot conclude, at least at this preliminary stage of the proceeding, that the district court clearly erred when it found that "[t]he Andersons had experience in the investment business, and should have been highly suspect of promises of such yields [on the media unit investments]. Yet they fell woefully short in verifying the legitimacy of the venture they were promoting." Opinion and Order, entered and served May 22, 1998, at 2. Therefore, we find that the Commission has shown a sufficient likelihood of succeeding in holding the Andersons personal-

ly liable for the actions of Financial to warrant preliminary relief.

### B. *Balance of the Equities*

■ The Andersons also argue that the district court ignored the hardships borne by the Andersons and Financial because of the issuance of the preliminary injunction. This argument ignores the fact that the district court released monies to pay Inter Com's operating expenses,[6] to pay Inter Com's employees, and to pay for the Andersons' living expenses and attorneys' fees. Therefore the burden of the preliminary injunction, although not insubstantial, is not as great as the Andersons claim. We find that the district court did not clearly err in balancing the equities involved in this case.

■ Under this Circuit's precedents, "when a district court balances the hardships of the public interest against a private interest, the public interest should receive greater weight." *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir.1989); *see also Warner Communications, Inc.*, 742 F.2d at 1165. Obviously, the public interest in preserving the illicit proceeds of the media unit-scheme for restitution to the victims is great.

Incredibly, the Andersons assert that "the district court did not find that there was a likelihood of asset dissipation." Appellants' Reply Brief at 7. This astounding assertion is made even in light of the clear finding of the district court that "[t]here is a substantial likelihood that, absent the continuation of the asset freeze, the Enjoined Defendants will conceal, dissipate, or otherwise divert their assets, thereby defeating the possibility of the Court granting effective final relief in the form of equitable monetary relief for consumers." Preliminary Injunction, entered and served May 22, 1998, at 2. Given the Andersons' history of spiriting their commissions away to a Cook Islands trust, which was intentionally designed to frus-

---

**6.** When the temporary restraining order was granted, the Andersons had already discontinued their involvement with Sterling. They were operating a new telemarketing company, Inter Com, in the same office in which they had operated Financial.

trate United States courts' powers to grant effective relief to prevailing parties, the district court's finding regarding the likelihood of dissipation is far from clearly erroneous.

Based on our review of the record, the district court did not clearly err in balancing the equities in this case simply because the court concluded that the important public interest in preserving the Andersons' steep commissions from the Ponzi scheme was more important than the private interests, the harm to which was minimized by the district court's release of monies to pay particular expenses. Therefore, we find that the Commission has adequately shown that the balance of the equities warrants preliminary injunctive relief.

## C. *Mootness*

■ The Andersons also contend that their cessation of sales for Sterling mooted the need for injunctive relief. In making this contention, the Andersons exhibit a startling misunderstanding of the nature of the preliminary relief that the district court actually granted. At a minimum, the Andersons' cessation of sales has no bearing on the need to repatriate the assets they have secreted off to the Cook Islands. More importantly, however, their argument mischaracterizes the law to such a degree that they are advocating a legal proposition that is precisely opposite the rule established by our precedents. As such, we conclude that the Commission's need for injunctive relief has not become moot.

The Andersons' first difficulty arises from their misunderstanding of the preliminary relief that the district court actually granted the Commission. The preliminary injunction contains both a prohibitory component and a mandatory component. In relevant part, the prohibitory component prohibited the Andersons from (1) engaging in certain types of business practices, (2) destroying any of their financial records, or (3) dissipating any of their assets. In relevant part, the mandatory component of the preliminary injunction required the Andersons to (1) prepare and deliver financial reports to the Commission's counsel, and (2) transfer to the United States all funds and assets held in foreign countries. While the Andersons' cessation of sales might possibly effect the need to restrain them from engaging in prohibited business practices, it could in no way affect the need to have the Andersons repatriate their assets from the Cook Islands. Therefore, the Andersons' cessation of sales for Sterling has not rendered moot the Commission's need for the mandatory component of the preliminary injunction.

■ The Andersons also appear to misunderstand the legal significance of their voluntary cessation of sales for Sterling in terms of the prohibitory aspect of the preliminary injunction. The Andersons contend that "[v]oluntary cessation of an unlawful course of conduct precludes the issuance of an injunction if there is no cognizable danger of recurrent violations." Appellants' Opening Brief at 28. Contrary to the Andersons' assertion, however, it is actually well-settled "that an action for an injunction does not become moot merely because the conduct complained of was terminated, *if there is a possibility of recurrence,* since otherwise the defendant's would be free to return to [their] old ways." *FTC v. American Standard Credit Systems, Inc.* 874 F.Supp. 1080, 1087 (C.D.Cal.1994) (quoting *Allee v. Medrano,* 416 U.S. 802, 811, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974)) (internal citations omitted) (emphasis added).

In part, the Andersons' misunderstanding may involve a misunderstanding of the difference between the effect of the perpetrator's conduct, as compared to the victim's conduct, on the need for injunctive relief. The difference is that the victim can moot her need for injunctive relief by her own conduct, but the alleged wrongdoer can not moot the need for injunctive relief as easily. This confusion becomes apparent from the cases upon which the Andersons rely. If an *employee* leaves the employ of an employer, she can not obtain injunctive relief to prevent her former em-

ployer from engaging in future retaliation in the workplace. *See Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1502 (D.C.Cir.1995). It would obviously be a different case if an *employer* claimed that an injunction to prevent future retaliation against current employees was no longer necessary because the employer had stopped retaliating against its employees in the workplace.

It is possible, of course, that a defendant's conduct can moot the need for injunctive relief, but the "test for mootness in cases such as this is a stringent one." *United States v. Concentrated Phosphate Export Ass'n, Inc.*, 393 U.S. 199, 203, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968). The reason that the defendant's conduct, in choosing to voluntarily cease some wrongdoing, is unlikely to moot the need for injunctive relief is that the defendant could simply begin the wrongful activity again: "Mere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave '[t]he defendant ... free to return to his old ways.'" *Id.* (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953)).

 The Andersons contend that they have satisfied their burden because "[t]he FTC did not offer any admissible evidence that the Andersons were likely to repeat any wrongful conduct." Appellants' Opening Brief at 28. This asserted failure on the part of the Commission, however, is not sufficient to satisfy the Andersons' burden of establishing that the need for injunctive relief has become moot as a result of their own conduct.[7] The standard for the voluntary cessation exception

to mootness is "whether the defendant is free to return to its illegal action at any time." *Public Utilities Comm'n of California v. Federal Energy Regulatory Comm'n*, 100 F.3d 1451, 1460 (9th Cir. 1996). In order to meet their burden, the Andersons must show that "subsequent events [have] made it absolutely clear that the allegedly wrongful behavior cannot reasonably be expected to recur." *Norman–Bloodsaw v. Lawrence Berkeley Laboratory*, 135 F.3d 1260, 1274 (9th Cir.1998) (internal quotation omitted); *cf. Lindquist v. Idaho State Bd. of Corrections*, 776 F.2d 851, 854 (9th Cir.1985) (A case may become moot as a result of voluntary cessation of wrongful conduct only if "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation."). The Andersons allege nothing that would suggest that it is "absolutely clear" that their wrongful activities are not reasonably likely to recur. Because they have failed to satisfy their burden, we can not conclude that the need for injunctive relief is moot solely because of the Andersons' cessation of their unlawful conduct.

In light of our conclusions regarding the Andersons' various challenges to the propriety of the district court's granting the Commission preliminary injunctive relief, we conclude that the district court did not abuse its discretion in issuing the preliminary injunction, based on the factual record available at such a preliminary stage of the proceeding.

### III

 The next issue on appeal is the district court's finding the Andersons in

---

7. Because the Andersons have failed to satisfy their burden of proving that they are not likely to resume engaging in illegal telemarketing activities, we do not decide today the merits of the Andersons' assertion that the Commission has failed to "offer any admissible evidence that the Andersons were likely to repeat any wrongful conduct." Nevertheless, we do note that one of the Andersons' complaints about the preliminary injunction is that it disrupted the operations of the Andersons' new telemarketing project, Inter

Com. According to the Andersons, Inter Com is involved with pre-paid residential telephone service rather than the sale of media units. Inter Com apparently is involved with Tel Com Plus, which was subject to at least one state cease and desist order. At this point, the factual record is insufficient for us to decide whether the Andersons' involvement in another fraudulent telemarketing scheme could provide a sufficient independent basis for the prohibitory aspect of the preliminary injunction.

contempt for refusing to repatriate the assets in their Cook Islands trust.[8] We review a district court's civil contempt order for an abuse of discretion. *Hilao v. Estate of Marcos*, 103 F.3d 762, 764 (9th Cir.1996). We review the district court's findings of fact in connection with the civil contempt adjudication for clear error. *Reliance Ins. Co. v. Mast Constr. Co.*, 84 F.3d 372, 375 (10th Cir.1996). We review a district court's findings in connection with rejecting an impossibility defense for clear error. *See Fortin v. Commissioner of Mass. Dep't of Pub. Welfare*, 692 F.2d 790, 797 (1st Cir.1982) (affirming contempt order when district court's finding that compliance was not impossible was not clearly erroneous). Based on the record before us, we find that the district court did not abuse its discretion in holding the Andersons in contempt.

■ The standard for finding a party in civil contempt is well settled:

The moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court. The burden then shifts to the contemnors to demonstrate why they were unable to comply.

*Stone v. City and County of San Francisco*, 968 F.2d 850, 856 n. 9 (9th Cir.1992) (citations omitted).

■ The temporary restraining order required the Andersons, in relevant part, to "transfer to the territory of the United States all funds, documents and assets in foreign countries held either: (1) by them; (2) for their benefit; or (3) under their direct or indirect control, jointly or singly." Temporary Restraining Order, entered and served April 23, 1998, at 8. These provisions were continued in the preliminary injunction. *See* Preliminary Injunc-

tion, entered and served May 22, 1998, at 9. It is undisputed that the Andersons are beneficiaries of an irrevocable trust established under the laws of the Cook Islands. The Andersons do not dispute that the trust assets have not been repatriated to the United States. Instead, the Andersons claim that compliance with the temporary restraining order is impossible because the trustee, in accordance with the terms of the trust, will not repatriate the trust assets to the United States.

■ A party's inability to comply with a judicial order constitutes a defense to a charge of civil contempt. *See United States v. Rylander*, 460 U.S. 752, 757, 103 S.Ct. 1548, 75 L.Ed.2d 521 (1983) ("While the court is bound by the enforcement order, it will not be blind to evidence that compliance is now factually impossible. Where compliance is impossible, neither the moving party nor the court has any reason to proceed with the civil contempt action."). The Andersons claim that the refusal of the foreign trustee to repatriate the trust assets to the United States, which apparently was the goal of the trust, makes their compliance with the preliminary injunction impossible.

Although the Andersons assert that their "inability to comply with a judicial decree is a complete defense to a charge of civil contempt, *regardless of whether the inability to comply is self-induced*," Appellants' Reply Brief at 12 (emphasis added), we are not certain that the Andersons' inability to comply in this case would be a defense to a finding of contempt. It is readily apparent that the Andersons' inability to comply with the district court's repatriation order is the intended result of their own conduct-their inability to comply and the foreign trustee's refusal to comply appears to be the precise goal of the Andersons' trust.[9] The Andersons claim

---

8. We have interlocutory appellate jurisdiction over the district court's adjudication of civil contempt where it is incident to an appeal from a preliminary injunction. *See Diamontiney v. Borg*, 918 F.2d 793, 796–97 (9th Cir. 1990).

9. The Andersons' trust created the circumstances in which a foreign trustee would refuse to repatriate assets to the United States by means of so-called duress provisions. Under the trust agreement, an event of duress includes "[t]he issuance of any order, decree

that they created their trust as part of an "asset protection plan." *See* Appellant's Opening Brief at 36. These "[s]o-called asset protection trusts are designed to shield wealth by moving it to a foreign jurisdiction that does not recognize U.S. judgments or other legal processes, such as asset freezes." Debra Baker, *Island Castaway*, ABA Journal, October 1998, at 55. The "asset protection" aspect of these foreign trusts arises from the ability of people, such as the Andersons, to frustrate and impede the United States courts by moving their assets beyond those courts' jurisdictions:

> Perhaps most importantly, situs courts typically ignore United States courts' demands to repatriate trust assets to the United States.. A situs court will not enforce a United States order from a state court compelling the turnover of trust assets to a creditor that was defrauded under United States law, or assets that were placed into a self-settled spendthrift trust.

James T. Lorenzetti, *The Offshore Trust: A Contemporary Asset Protection Scheme*, 102 Com. L.J. 138, 143–144 (1997).

Because these asset protection trusts move the trust assets beyond the jurisdiction of domestic courts, often times all that remains within the jurisdiction is the physical person of the defendant. Because the physical person of the defendant remains subject to domestic courts' jurisdictions, courts could normally utilize their con-

tempt powers to force a defendant to return the assets to their jurisdictions. Recognizing this risk, asset protection trusts typically are designed so that a defendant can assert that compliance with a court's order to repatriate the trust assets is impossible:

> Another common issue is whether the client may someday be in the awkward position of either having to repatriate assets or else be held in contempt of court. A well-drafted [asset protection trust] would, under such a circumstance, make it impossible for the client to repatriate assets held by the trust. Impossibility of performance is a complete defense to a civil contempt charge.

Barry S. Engel, *Using Foreign Situs Trusts For Asset Protection Planning*, 20 Est. Plan. 212, 218 (1993).

■ Given that these offshore trusts operate by means of frustrating domestic courts' jurisdiction, we are unsure that we would find that the Andersons' inability to comply with the district court's order is a defense to a civil contempt charge. We leave for another day the resolution of this more difficult question because we find that the Andersons have not satisfied their burden of proving that compliance with the district court's repatriation order was impossible. It is well established that a party petitioning for an adjudication that another party is in civil contempt does not have the burden of showing that the other

---

or judgment of any court or tribunal in any part of the world which in the opinion of the protector will or may directly or indirectly, expropriate, sequester, levy, lien or in any way control, restrict or prevent the free disposal by a trustee of any monies, investments or property which may from time to time be included in or form part of this trust and any distributions therefrom." Trust Agreement at 3. Upon the happening of an event of duress, the trust agreement provides that the Andersons would be terminated as co-trustees, so that control over the trust assets would appear to be exclusively in the hands of a foreign trustee, beyond the jurisdiction of a United States court:

> Notwithstanding any other provision contained in this deed any trustee hereof shall

automatically cease to be a trustee upon the happening of an event of duress within the territory where such trustee is ... resident (in the case of an individual) and upon ceasing to be a trustee pursuant to this clause such trustee shall be divested of title to the property of this trust which shall automatically vest in the remaining or continuing trustee (if any) *located in a territory not having an event of duress and the form for administration of this trust shall notwithstanding any other provision in this deed be deemed to be the place of residence or incorporation (if a corporation) of such continuing trustee.*

Trust Agreement at 17 (emphasis added).

party has the capacity to comply with the court's order. *See NLRB v. Trans Ocean Export Packing, Inc.,* 473 F.2d 612, 616 (9th Cir.1973). Instead, the party asserting the impossibility defense must show "categorically and in detail" why he is unable to comply. *Id.; See also Rylander,* 460 U.S. at 757, 103 S.Ct. 1548 ("It is settled, however, that in raising this defense, the defendant has a burden of production.").

■ In the asset protection trust context, moreover, the burden on the party asserting an impossibility defense will be particularly high because of the likelihood that any attempted compliance with the court's orders will be merely a charade rather than a good faith effort to comply. Foreign trusts are often designed to assist the settlor in avoiding being held in contempt of a domestic court while only feigning compliance with the court's orders:

> Finally, the settlor should be aware that, although his trust will probably prove unassailable by domestic creditors, he may face minor hassles while defending his trust in court. In particular, if a creditor attacks an offshore trust in United States court, the settlor may face contempt of court orders during the proceedings.... [T]here is a possibility that the court will ... order the settlor to collect his assets from the trust and turn them over to the court. If the settlor does not comply with these orders, a court may hold him in contempt. However, there are ways around such a conflict.... [T]he settlor could comply with the court order and 'order' his trustee to turn over the funds, knowing full well that the trustee will not comply with his request. Thereby, the settlor would technically comply with the court's orders, escape contempt of court charges, and still rest assured that his assets will remain protected.

James T. Lorenzetti, *The Offshore Trust: A Contemporary Asset Protection Scheme,* 102 Com. L.J. 138, 158 (1997). With foreign laws designed to frustrate the operation of domestic courts and for-eign trustees acting in concert with domestic persons to thwart the United States courts, the domestic courts will have to be especially chary of accepting a defendant's assertions that repatriation or other compliance with a court's order concerning a foreign trust is impossible. Consequently, the burden on the defendant of proving impossibility as a defense to a contempt charge will be especially high.

Given these considerations, we cannot find that the district court clearly erred in finding that the Andersons' compliance with the repatriation order was not impossible because the Andersons remain in control of their Cook Islands trust. In finding the Andersons in civil contempt, the district court rejected the Andersons' impossibility defense, specifically finding that the Andersons "in the judgment of the Court [and] from the evidence that I've heard are in control of this trust." Transcript of June 17, 1998 Hearing Regarding Plaintiff's Motion for Civil Contempt, p. 30. Because we only review a district court's findings in connection with rejecting an impossibility defense for clear error, we will treat the district court's finding that the Andersons were in control of their trust as a finding of fact, subject only to the clearly erroneous standard of review. Based upon the record before us, we find that the district court's finding that compliance with the repatriation order was possible because the Andersons remain in control of their trust was not clearly erroneous.

The Andersons claim that they have "demonstrated to the district court 'categorically and in detail' that they can not comply with the repatriation section of the preliminary injunction." Appellants' Reply Brief at 13. The district court was not convinced and neither are we. While it is possible that a rational person would send millions of dollars overseas and retain absolutely no control over the assets, we share the district court's skepticism. The

district court found, notwithstanding the Andersons' protestations, that

> As I look at the totality of the scheme of what I see before me at this time, I have no doubt that the Andersons can if they wish to correct this problem and provide the means of putting these funds in a position that they can be accountable if the final determination of the Court is that the funds should be returned to those who made these payments.

Transcript of June 9, 1998 Hearing Regarding Plaintiff's Motion for Civil Contempt, p. 18.

We cannot say that this finding was clearly erroneous. The Andersons had previously been able to obtain in excess of $1 million from the trust in order to pay their taxes. Given their ability to obtain, with ease, such large sums from the trust, we share the district court's skepticism regarding the Andersons' claim that they cannot make the trust assets subject to the court's jurisdiction.

Moreover, beyond this general skepticism concerning the Andersons' lack of control over their trust, the specifics of the Andersons' trust indicate that they retained control over the trust assets. These offshore trusts allow settlors, such as the Andersons, significant control over the trust assets by allowing the settlor to act as a cotrustee or "protector" of the trust. *See* Debra Baker, *Island Castaway*, ABA Journal, October 1998, at 56 ("Further, an offshore trust, may allow settlors to maintain significant control over their assets. Trusts can include cotrustees in the United States to watch over the actions of the foreign trustees, and settlors can name anyone, including themselves, as 'protectors' to oversee the trustees and veto their actions if necessary."). When the settlors retain this type of control, however, they can jeopardize the asset protection scheme because they will be subject to a U.S. court's personal jurisdiction and be forced to exercise their control to repatriate the assets. *See id.* ("If litigation is threatened, the protector and the co-trustee can resign so that no one within the personal jurisdiction of a federal or state court has control over the assets of the trust.").

The district court's finding that the Andersons were in control of their trust is well supported by the record given that the Andersons were the protectors of their trust. A protector has significant powers to control an offshore trust. *See* Gideon Rothschild, "Establishing and Drafting Offshore Asset Protection Trusts," 23 Est. Plan. 65, 70 (1996) ("The use of a trust protector or advisor is common among foreign trusts. This person ... has the power to replace trustees and veto certain actions by the trustees."). A protector can be compelled to exercise control over a trust to repatriate assets if the protector's powers are not drafted solely as the negative powers to veto trustee decisions or if the protector's powers are not subject to the anti-duress provisions of the trust. *See id.* ("The protector's powers should generally be drafted as negative powers and subject to the anti-duress provisions to protect against an order compelling the protector to exercise control over the trust."). The Andersons' trust gives them affirmative powers to appoint new trustees and makes the anti-duress provisions subject to the protectors' powers,[10] therefore, they can force the foreign trustee to repatriate the trust assets to the United States.

Perhaps the most telling evidence of the Andersons' control over the trust was their conduct after the district court issued its temporary restraining order ordering the repatriation of the trust funds. The Andersons sent a notice to the foreign

---

10. For example, the trust provides the protectors with discretion to conclusively determine that an event of duress has not occurred: "For the purpose of determining whether an Event of Duress has occurred pursuant to paragraph (c) and paragraph (d) of this clause (1)(a)(vi) of this Deed, *the written certificate of the Protector to that effect shall be conclusive.*" Trust Agreement at 3 (emphasis added).

trustee, ordering it to repatriate the trust assets because the district court had issued a temporary restraining order. The foreign trustee removed the Andersons from their positions as co-trustees and refused to comply with the repatriation order. After the Andersons claimed that compliance with the repatriation provisions of the temporary restraining order was impossible, the Commission revealed to the court that the Andersons were the protectors of the trust. The Andersons immediately attempted to resign as protectors of the trust. This attempted resignation indicates that the Andersons knew that, as the protectors of the trust, they remained in control of the trust and could force the foreign trustee to repatriate the assets.[11]

The Andersons contend that even though they are the protectors of the trust, it is impossible for them to repatriate the trust assets. The Andersons' argument, that "[t]here is a misstep in the FTC's logic," Appellants' Reply Brief at 17, ignores the fact that they bear the burden of proving impossibility, not the Commission. Their pointing to a few provisions of the trust, alone,[12] is insufficient to carry their burden or to establish that the district court's finding that they remain in control of their trust was clearly erroneous.[13]

Because we see no clear error in the district court's finding that the Andersons remain in control of their trust and could repatriate the trust assets, the district court did not abuse its discretion in holding them in contempt. We, therefore, affirm the district court's finding the Andersons in contempt. Given the nature of the Andersons' so-called "asset protection" trust, which was designed to frustrate the power of United States' courts to enforce judgments, there may be little else that a district court judge can do besides exercise its contempt powers to coerce people like the Andersons into removing the obstacles they placed in the way of a

11. Although we have concentrated on the Andersons' capacity as protectors of the trust to support the district court's finding that the Andersons remain in control of the trust, we have not considered whether other facts might support the Andersons' continuing control over the trust, regardless of who is the protector of the trust. The Andersons attempted to resign their position as protectors and that attempt appears to have failed. If the Andersons have in fact resigned their position as protectors, they may still remain in control of the trust. We have not resolved this issue at this time because the Andersons have conceded that they are the protectors of the trust.

12. The district court excluded evidence that the Andersons claimed supported their impossibility defense. The Andersons did not challenge this evidentiary ruling at all until their Reply Brief. Accordingly, we will not consider the propriety of the district court's exclusion of the Andersons' evidence concerning impossibility. *See All Pacific Trading, Inc. v. Vessel M/V Hanjin Yosu,* 7 F.3d 1427, 1434 (9th Cir.1993). Moreover, what little the Andersons say in their Reply Brief cannot be considered an adequate argument challenging the district court's evidentiary ruling. From the Andersons' meager assertions, it is unclear what their challenge to the district court's ruling would be.

13. The provisions of the trust also make clear that the Andersons' position as protectors gives them control over the trust. In provisions of the trust agreement that the Andersons conveniently fail to reference, the trust agreement makes clear that the Andersons, as protectors, have the power to determine whether or not an event of duress has occurred: "For the purpose of determining whether an Event of Duress has occurred pursuant to paragraph (c) and paragraph (d) of this clause (1)(a)(vi) of this Deed, *the written certificate of the Protector to that effect shall be conclusive.*" Trust Agreement at 3 (emphasis added). Moreover, the very definition of an event of duress that the Andersons assert has occurred makes clear that whether or not an event of duress has occurred depends upon the opinion of the protector: "The issuance of any order, decree or judgement of any court or tribunal in any part of the world *which in the opinion of the Protector* will or may directly or indirectly, expropriate...." Trust Agreement at 3 (emphasis added). Therefore, notwithstanding the provisions of the trust agreement that the Andersons point to, it is clear that the Andersons could have ordered the trust assets repatriated simply by certifying to the foreign trustee that in their opinion, as protectors, no event of duress had occurred.

court. Given that the Andersons' trust is operating precisely as they intended, we are not overly sympathetic to their claims and would be hesitant to overly-restrict the district court's discretion, and thus legitimize what the Andersons have done.

AFFIRMED.