**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

LGS ARCHITECTS, INC., a Nevada
Corporation; LGS NEVADA, a
Nevada Corporation,
                    *Plaintiffs-Appellants,*

v.

CONCORDIA HOMES OF NEVADA,
                    *Defendant-Appellee.*

No. 04-16677

D.C. No.
CV-04-00574-RCJ

OPINION

Appeal from the United States District Court
for the District of Nevada
Robert C. Jones, District Judge, Presiding

Argued and Submitted
April 13, 2005—San Francisco, California

Filed January 11, 2006

Before: Robert R. Beezer, Diarmuid F. O'Scannlain, and
Andrew J. Kleinfeld, Circuit Judges.

Opinion by Judge O'Scannlain

## COUNSEL

Michael J. McCue, Lewis and Roca LLP, Las Vegas, Nevada, argued the cause for the appellants; W. West Allen, Lewis and Roca LLP, Las Vegas, Nevada, was on the briefs.

John M. Naylor, Lionel Sawyer & Collins, Las Vegas, Nevada, argued the cause for the appellee; Samuel S. Lionel, Lionel Sawyer & Collins, Las Vegas, Nevada, was on the brief.

## OPINION

O'SCANNLAIN, Circuit Judge:

We must decide whether an architectural firm is entitled to a preliminary injunction prohibiting a client from using its

copyrighted designs on projects that fall outside the scope of their licensing agreement.

I

In November 2001, LGS Architects, Inc. ("LGS") and Concordia Homes of Nevada ("Concordia") entered into a licensing agreement that authorized Concordia to use two of LGS's architectural plans to construct Arbor Glen I, a master-planned community of eighty houses in northwestern Las Vegas. The parties later signed two "Additional Service" agreements, each of which authorized Concordia to use another of LGS's architectural plans in the construction of Arbor Glen I. LGS has registered all four of these plans with the United States Copyright Office.

The licensing agreement is based upon the language of the American Institute of Architects' Standard Form of Agreement for Residential Projects, and it provides that

> [a]ll architectural documents prepared by Architect pursuant to this contract are instrumentalities of the Architect's services and are Architect's property solely for use by the Client on this project and no other. Any other use of such architectural documents is prohibited unless the Client first obtains express written authorization from Architect. Such authorization may be subject to an appropriate reuse fee as determined be [sic] Architect.

Licensing Agreement ("Licensing Agr.") Ex. A ¶ B.1. The licensing agreement's Standard Rate Schedule establishes a "reuse fee" of "$3,600.00 plus $60.00 / unit plotted" "for using plans developed under this contract in locations other than the original location" and reiterates that the "Client must procure the written permission of the Architect prior to the commencement of such reuse of said plans." *Id.* Ex. C. These provisions are also applicable to the parties' "Additional Ser-

vice" agreements. *See* Authorization for Additional Services (Nov. 18, 2002) ("All other terms and conditions of the original contract[ ]shall remain in effect as related to these Additional Services."); Authorization for Additional Services (Mar. 14, 2002) (same).

In July 2003, Concordia decided to use LGS's four Arbor Glen I plans to construct houses in the adjacent Arbor Glen II community. LGS requested that Concordia sign a new licensing agreement before reusing its plans. Concordia was unwilling to do so, however, because it believed that Arbor Glen II was covered by the original licensing agreement's reuse provisions. Relying upon those provisions, Concordia remitted a reuse fee of $10,860 to LGS, which represented $60.00 for each of the 181 additional homes planned for Arbor Glen II. LGS refused to accept this payment because Concordia omitted the $3,600 "base reuse fee" for which the licensing agreement provides.[1] Concordia concedes that it miscalculated this payment and alleges that it later attempted to correct this error by offering LGS a $3,600 base reuse fee, which LGS rejected. LGS contends that no such offer was ever made.

Notwithstanding this dispute about whether Concordia made a second payment attempt, the parties agree that LGS never accepted a reuse fee from Concordia and that it never gave Concordia written authorization to use the architectural plans to construct Arbor Glen II. Concordia nevertheless proceeded with the construction of Arbor Glen II based upon LGS's architectural plans. The project, which was eventually scaled back from 181 to 68 houses, was completed in August 2004, and all of the houses have now been sold.

---

[1]The parties dispute the manner in which the base reuse fee should be calculated. LGS argues that the $3,600 fee should be imposed on a per-plan basis (thus totaling $14,400 for the four plans at issue), while Concordia contends that the fee should be assessed at a flat rate of $3,600 that does not vary with the number of plans used.

In May 2004, LGS filed suit against Concordia in the United States District Court for the District of Nevada alleging copyright infringement and breach of contract. LGS moved for a preliminary injunction 1) prohibiting Concordia from constructing and selling houses based upon LGS's architectural plans, 2) prohibiting Concordia from reproducing, distributing, or publicly displaying those plans, and 3) ordering Concordia to return the disputed plans. Without setting forth findings of fact or conclusions of law, the district court denied the preliminary injunction motion on the ground that LGS does not have a likelihood of success on the merits. LGS timely filed this interlocutory appeal from the district court's denial of its preliminary injunction motion.

Concordia thereafter filed a motion to dismiss the appeal on the ground that the completion of Arbor Glen II has mooted LGS's preliminary injunction request. The motion was denied by the Appellate Commissioner without prejudice to Concordia raising the mootness issue before the merits panel.

II

Concordia now renews its argument that this interlocutory appeal is moot, and we therefore first determine whether we possess jurisdiction to entertain this appeal.

A

[1] Article III of the United States Constitution requires the existence of a live case or controversy throughout all stages of federal judicial proceedings. *See Gator.com Corp. v. L.L. Bean, Inc.*, 398 F.3d 1125, 1128-29 (9th Cir. 2005) (en banc). Accordingly, "[w]here the activities sought to be enjoined already have occurred, and the appellate courts cannot undo what has already been done, the action is moot, and must be dismissed" for lack of jurisdiction. *Bernhardt v. County of Los Angeles*, 279 F.3d 862, 871 (9th Cir. 2002); *see also Am. Tunaboat Ass'n v. Brown*, 67 F.3d 1404, 1407 (9th Cir. 1995)

(holding that an appeal from the denial of a preliminary injunction prohibiting the federal government from temporarily closing certain tuna fisheries was moot because the fisheries had reopened by the time the appeal was argued).

**[2]** Here, one of the forms of relief sought by LGS is a preliminary injunction prohibiting Concordia from constructing new homes based upon its architectural plans. To the extent that LGS is seeking to enjoin the construction of Arbor Glen II, its request for relief is moot because that project has been completed. We are powerless to undo such a *fait accompli.*

B

Concordia argues that not only is LGS's request to enjoin Arbor Glen II moot but that this entire appeal is moot because Concordia has represented that it will not make future use of the disputed architectural plans. To that end, Concordia states in its answering brief that it "does not intend to use the Arbor Glen I plans at any time in the future . . . and has no intent to reproduce, prepare derivative works, distribute, or publicly display the plans." Ans. Br. 17. Concordia's president submitted an affidavit to the district court that included a nearly identical statement.

**[3]** It is exceedingly rare, however, for a defendant's voluntary termination of allegedly wrongful activity to render an appeal moot. "Voluntary cessation of challenged conduct moots a case . . . only if it is *absolutely* clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222 (2000) (per curiam) (internal quotation marks omitted). In *Federal Trade Commission v. Affordable Media, LLC*, 179 F.3d 1228, 1232 (9th Cir. 1999), for example, the district court issued a preliminary injunction ordering the defendants to cease their participation in a fraudulent telemarketing business. On interlocutory appeal, the defendants argued that the request for injunctive relief was moot because they had volun-

tarily discontinued their involvement in the business. *Id.* at 1237. We rejected the defendants' mootness argument and explained that "an action for an injunction does not become moot merely because the conduct complained of was terminated, if there is a possibility of recurrence, since otherwise the defendant's [sic] would be free to return to [their] old ways." *Id.* (internal quotation marks and emphasis omitted; second alteration in original); *see also Jacobus v. Alaska*, 338 F.3d 1095, 1103 (9th Cir. 2003) (holding that a § 1983 action challenging Alaska's campaign finance laws was not moot, even though the statutes in question had been repealed, because the State's voluntary cessation of its alleged wrongdoing did not foreclose the possibility of future reenactment).

Concordia's representation that it has no intention to use LGS's architectural plans in the future does not make it "absolutely clear" that Concordia will permanently refrain from future infringement. If the opposite were true, any defendant could moot a preliminary injunction appeal by simply representing to the court that it will cease its wrongdoing. Indeed, it is not even apparent from the record whether Concordia has presently discontinued its use of LGS's copyrighted material. Although all of the houses in Arbor Glen II have now been sold, Concordia nowhere avers that it has ceased reproducing, distributing, or publicly displaying the plans in connection with that project.[2]

The First Circuit's decision in *CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc.*—the case upon which Concordia principally relies—is not to the contrary. 48 F.3d 618 (1st

---

[2]The representation of Concordia's president that the company does not intend to make future use of LGS's copyrighted materials was made while the construction of Arbor Glen II was ongoing. The affidavit did not indicate when that representation of future noninfringement would go into effect. Concordia's reiteration of this representation in its answering brief was premised upon the earlier statement by the company's president and likewise does not identify the point at which Concordia's noninfringement would commence.

Cir. 1995). There, the court concluded that an appeal from the denial of a preliminary injunction was moot because the radio contest that the plaintiff sought to enjoin had ended. *Id.* at 621. The plaintiff suggested that the possibility of the defendant conducting another contest preserved a live controversy, but the court rejected that argument because the defendant had represented that it would not operate additional contests until the litigation had ended. *Id.* at 622. The instant case is distinguished from *CMM Cable* by the uncertainty as to whether infringement is presently ongoing.[3]

Furthermore, even if Concordia's representation did moot LGS's request for a preliminary injunction prohibiting the future use of the architectural plans, it would not moot LGS's request for a mandatory injunction ordering Concordia to return the disputed plans. Indeed, in *Affordable Media*, 179 F.3d at 1237, we emphasized that the defendants' voluntary cessation of their fraudulent telemarketing scheme could not conceivably have mooted the government's request for a mandatory injunction ordering the defendants to prepare certain financial reports and to transfer their overseas funds to the United States. *See id.* (the defendants' cessation of wrongdoing "has not rendered moot the Commission's need for the mandatory component of the preliminary injunction"). Thus, whether or not LGS is ultimately entitled to mandatory

---

[3]Moreover, the continuing validity of *CMM Cable* is called into question by the First Circuit's subsequent decision in *American Board of Psychiatry & Neurology, Inc. v. Johnson-Powell*, 129 F.3d 1, 6 (1st Cir. 1997), where the court concluded that it would have been appropriate for a district court to award a preliminary injunction against an alleged trademark infringer even though the defendant had submitted an affidavit averring that she would not engage in future infringement. *See id.* ("on this record, the court could undoubtedly have issued preliminary injunctive relief had it been so inclined"). Although the First Circuit ultimately held that the district court did not abuse its discretion by refusing to issue a preliminary injunction, the court reached the merits of the appeal and did not conclude that the defendant's representation of future noninfringement rendered the matter moot. *Id.*

injunctive relief, its request for that relief continues to present a live controversy.

## C

**[4]** Because it is not absolutely clear that Concordia has permanently ceased all infringing activity and there exists the possibility of awarding LGS mandatory injunctive relief, this appeal is not moot.

## III

Having determined that we possess jurisdiction over this appeal, we now turn to the merits of LGS's request for a preliminary injunction.

## A

**[5]** A district court must set forth findings of fact and conclusions of law supporting an order denying a preliminary injunction. *See* Fed. R. Civ. P. 52(a) ("in granting or refusing interlocutory injunctions the court shall . . . set forth the findings of fact and conclusions of law which constitute the grounds of its action"). We may "remand for further findings of fact and conclusions of law where a district court's findings and conclusions . . . are not sufficient to permit meaningful review." *Fed. Trade Comm'n v. Enforma Natural Prods., Inc.*, 362 F.3d 1204, 1212 (9th Cir. 2004).

**[6]** Here, the district court's only explanation for its denial of a preliminary injunction was the statement that it did not consider LGS to have a likelihood of success on the merits. Dist. Ct. Tr. at 7. ("I'm going to deny your request, sir. I don't see your likelihood of success on the merit [sic]."). This conclusory observation does not adequately set forth the basis for the district court's denial of injunctive relief because it does not provide any analysis of the likelihood-of-success issue.

Both parties acknowledge this deficiency, although neither contends that remand is necessary.

**[7]** We agree. LGS's entitlement to a preliminary injunction hinges upon the legal interpretation of the parties' licensing agreement, rather than upon disputed factual issues. *See Farmers Ins. Exch. v. Neal*, 64 P.3d 472, 473 (Nev. 2003) (per curiam) ("Interpretation of a contract is a question of law . . . ."). Because we consider legal questions *de novo*, the absence of oral or written conclusions of law does not preclude us from undertaking meaningful appellate review. Remand for further findings of fact and conclusions of law is therefore unnecessary. *See Enforma Natural Prods.*, 362 F.3d at 1212 ("A failure to comply with Rule 52(a) does not require reversal unless a full understanding of the question is not possible without the aid of separate findings.").

B

**[8]** "Preliminary injunctive relief is available to a party who demonstrates either: (1) a combination of probable success on the merits and the possibility of irreparable harm; or (2) that serious questions are raised and the balance of hardships tips in its favor. These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001) (internal quotation marks and citation omitted). In a copyright infringement action, however, "a showing of a reasonable likelihood of success on the merits raises a presumption of irreparable harm." *Johnson Controls, Inc. v. Phoenix Control Sys., Inc.*, 886 F.2d 1173, 1174 (9th Cir. 1989); *see also Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1119 (9th Cir. 1999) ("Under federal copyright law, . . . a plaintiff that demonstrates a likelihood of success on the merits of a copyright infringement claim is entitled to a presumption of irreparable harm."). A copyright holder seeking a preliminary injunction is therefore not required to make an

independent demonstration of irreparable harm. *See* 4 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 14.06[A] (2004) ("the plaintiff's burden for obtaining a preliminary injunction in copyright cases collapses to showing likelihood of success on the merits, without a detailed showing of danger of irreparable harm" (footnotes omitted)). Accordingly, LGS "need only show a reasonable likelihood of success on its copyright infringement claim" to obtain a preliminary injunction. *Johnson Controls, Inc.*, 886 F.2d at 1174.

A plaintiff must meet two requirements to establish a prima facie case of copyright infringement: (1) ownership of the allegedly infringed material and (2) violation by the alleged infringer of at least one of the exclusive rights granted to copyright holders. *See Napster, Inc.*, 239 F.3d at 1013; *see also* 17 U.S.C. § 106 (granting copyright holders the exclusive right to reproduce the copyrighted work, to distribute copies of the work, and to display the work publicly).

**[9]** When a licensee exceeds the scope of the license granted by the copyright holder, the licensee is liable for infringement. *See Sun Microsystems, Inc.*, 188 F.3d at 1121 ("If . . . a license is limited in scope and the licensee acts outside the scope, the licensor can bring an action for copyright infringement."); *see also* 3 Nimmer & Nimmer, *supra*, § 10.15[A] ("when a license is limited in scope, exploitation of the copyrighted work outside the specified limits constitutes infringement"). In *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1083-84 (9th Cir. 1989), for example, a software designer that had granted a payroll company a license to use its copyrighted software alleged that the licensee had infringed its copyright by preparing and duplicating a modified version of the program. We observed that a "license must be construed in accordance with the purposes underlying federal copyright law. Chief among these purposes is the protection of the author's rights." *Id.* at 1088 (citation omitted). We concluded that the payroll company, which possessed the right to use the software but had not acquired any ownership

rights, had exceeded the scope of its license by modifying and copying the program. *Id.* at 1089. The case was remanded for the district court to consider whether the payroll company had any valid defenses to the infringement action. *Id.* at 1089 & n.11.

Similarly, in *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 511 (9th Cir. 1985), a hotel obtained a license to present public performances of copyrighted music. The license specifically excluded "songs [accompanied by] visual representation of the work from which the music is taken." *Id.* (alteration in original). We concluded that the hotel exceeded the scope of its license—and thereby committed copyright infringement—when it held a performance that included both music and representations of movie scenes because the licensing agreement expressly prohibited such activity. *Id.* at 512.

**[10]** Here, Concordia does not dispute that LGS owns a valid copyright in the four architectural plans, and thus LGS's likelihood of success on the merits depends solely upon whether Concordia exceeded the scope of its license. LGS granted Concordia a license to use its four architectural plans to construct the eighty homes in the Arbor Glen I community. The licensing agreement explicitly provided that "[a]ny other use of such architectural documents is prohibited unless the Client first obtains express written authorization from Architect. Such authorization may be subject to an appropriate reuse fee as determined be [sic] Architect." Licensing Agr. Ex. A ¶ B.1; *see also id.* Ex. C (establishing a reuse fee of "$3,600.00 plus $60.00 / unit plotted" "for using plans developed under this contract in locations other than the original location"). The scope of Concordia's license was therefore limited to the construction of Arbor Glen I, unless LGS gave Concordia written authorization to utilize the plans in other projects and received a reuse fee for such additional use. Because LGS never authorized Concordia to reuse its plans in the construction of Arbor Glen II—and Concordia never paid

the reuse fee upon which such authorization was conditioned —Concordia exceeded the scope of its license when it used the four architectural plans in the construction of Arbor Glen II.[4]

[11] Concordia's defense that LGS breached the covenant of good faith and fair dealing by refusing to authorize reuse is unavailing. Even if it is consistent with copyright law to imply such a covenant into the licensing agreement (a question that we need not decide), there is no evidence in the record that Concordia ever tendered the correct reuse fee to LGS. Although Concordia did remit a $10,860 payment, LGS returned the check because this amount did not include the requisite base reuse fee. The parties' dispute over whether this base fee should be calculated at a flat rate (as Concordia claims) or on a per-plan basis (as LGS claims) is irrelevant because—at least as far as the current record reveals— Concordia never tendered *any* base reuse fee.[5] In light of Con-

---

[4]Concordia alleges that the plan it received under the parties' second "Additional Service" agreement was intended exclusively for Arbor Glen II; LGS contends that this plan was designed for Arbor Glen I. On the record before us, it is impossible to resolve this factual issue authoritatively because discovery has not yet taken place. Our task is further hindered by the fact that the relevant "Additional Service" agreement ambiguously refers to the project in question as "Arbor Glen." Nevertheless, that agreement does specify that it is subject to "[a]ll . . . terms and conditions of the original contract," Authorization for Additional Services (Nov. 18, 2002), which suggests that the permissible uses of this additional plan are coterminous with the original licensing agreement's scope. We therefore find for purposes of this appeal that Concordia was only authorized to use the additional plan in the construction of Arbor Glen I. The district court is free to revisit this factual issue with the benefit of full discovery.

[5]Concordia contends that, after it realized its error in calculating the fee, it offered to pay LGS a $3,600 base reuse fee. LGS disputes this assertion and alleges that Concordia never offered to pay *any* base reuse fee. On this undeveloped record, we are unable to resolve this factual dispute with certainty. It is probative, however, that while the record does contain both correspondence and a check evidencing Concordia's initial $10,860 offer of payment, Concordia has not proffered any evidence to support its assertion that it later tendered a second payment that included the base reuse fee. Accordingly, for purposes of this appeal, there is no basis for finding that Concordia tendered a second payment to LGS.

cordia's failure to pay the fee that was an explicit contractual prerequisite to the architectural plans' reuse, LGS did not act in bad faith when it refused to authorize Concordia to use the plans in the construction of Arbor Glen II.

C

**[12]** Because Concordia exceeded the scope of the licensing agreement, LGS is likely to succeed on the merits of its copyright infringement claim. LGS is therefore entitled to a preliminary injunction prohibiting Concordia from reproducing, distributing, publicly displaying, or creating derivative works based upon LGS's architectural plans. *See Johnson Controls, Inc.*, 886 F.2d at 1177 (affirming the entry of a preliminary injunction in a copyright infringement action upon concluding that the copyright holder was likely to succeed on the merits). Such an injunction will preserve the status quo until the district court resolves the merits of this case.

At this stage of the proceedings, however, LGS is not entitled to a mandatory injunction requiring Concordia to return the plans. "A mandatory injunction goes well beyond simply maintaining the status quo *pendente lite* [and] is particularly disfavored." *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994) (alteration in original). Mandatory relief is unnecessary in this case because it will not further the "purpose of a preliminary injunction, [which] is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). If LGS prevails on summary judgment or after a trial on the merits, the district court should then consider whether to award LGS a mandatory injunction requiring Concordia to return the plans.

IV

Because LGS is likely to succeed on the merits of its copyright infringement claim, the district court is directed to enter

a preliminary injunction prohibiting Concordia from reproducing, distributing, publicly displaying, or creating derivative works based upon LGS's architectural plans.

**REVERSED** and **REMANDED** for further proceedings consistent with this opinion.