# United States Court of Appeals

## For the First Circuit

No. 03-2561

DOMENICK NICOLACI; ROSALIE HASSEY;
LISA BOLING; LORI BOLING RANDALL,

Plaintiffs, Appellants,

JOHN NICOLACI,

Intervening Plaintiff, Appellant,

v.

JOEL ANAPOL; WALTER ANAPOL,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before
Boudin, Chief Judge,
Lynch, Circuit Judge,
and Schwarzer,* Senior District Judge.

Todd A. Newman and Kent D. B. Sinclair, with whom
Charles R. Bennett, Jr., Louis J. DiFronzo, Jr., Hanify & King,
P.C. and Seyfarth Shaw L.L.C. were on brief, for appellant.

Frederic D. Grant, Jr., for appellee.

October 20, 2004

*Of the Northern District of California, sitting by designation.

**SCHWARZER**, <u>Senior District Judge</u>. Domenick Nicolaci, Rosalie Hassey, Lisa Boling, and Lori Boling Randall, with John Nicolaci as an intervening plaintiff-appellant (together "the Nicolacis"), appeal the District Court's dismissal of their contractual and common law indemnification claims against Joel and Walter Anapol ("the Anapols"). For the reasons stated below, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The Nicolacis are former shareholders in Cliftex Corporation ("Cliftex"), a closely-held corporation. On January 16, 1998, the Nicolacis, the Anapols and Cliftex executed a Stock Purchase Agreement under which the Nicolacis sold their shares back to Cliftex. The Anapols were officers, directors, and shareholders of Cliftex at the time. The Nicolacis received varying amounts of money for their shares, ranging from $1,000,000 paid to John Nicolaci, to $25,000 paid to Lori and Lisa Boling. The Agreement included cross-releases by the sellers and the buyers as well as an indemnity clause from the buyers to the sellers. The release and indemnity given by Cliftex and the Anapols provided as follows:

> (b) Each of Cliftex, Joel Anapol and Walter Anapol hereby:
>
> (i) releases and discharges each of the Sellers and their respective heirs, representatives and assigns from and against any claims, rights or causes of action which such person may have against such Seller

-2-

arising from any fact, circumstance or condition existing on the date hereof, whether or not such claims, rights or causes of action are known to Cliftex, Joel Anapol or Walter Anapol, as the case may be, provided, however, that <u>this release shall not cover or apply to any claims arising under this Agreement</u> or any agreement or instrument delivered in connection herewith; and

(ii) agrees to indemnify and hold harmless each of the Sellers and their respective heirs, representatives and assigns from and against any claims, rights or causes of action <u>which relate to or which arise or arose out of the business of Cliftex as operated prior to or after the date of this Agreement</u> except to the extent the same have been caused or incurred solely as the result of the unauthorized and wrongful action of the party seeking to be indemnified. . . . (Emphasis added.)

About two and a half years later, in August 2000, Cliftex filed a voluntary Chapter 7 bankruptcy petition in the District of Massachusetts. A trustee of the estate was appointed. The Trustee commenced an adversary proceeding in the Bankruptcy Court alleging that the stock purchase constituted a fraudulent transfer and demanding that the Nicolacis return the money they received in exchange for their shares. The Nicolacis filed a third-party complaint in the Trustee's proceeding, asserting a claim for indemnity against the Anapols for any liability incurred as a result of the fraudulent transfer claim. On October 17, 2002, the Bankruptcy Court dismissed the Nicolacis' complaint for lack of jurisdiction.

-3-

The Nicolacis then commenced this action, again asserting their indemnification claims against the Anapols under the Agreement and Massachusetts common law. Treating the Anapols' motion for judgment on the pleadings as a Rule 12(b)(6) motion to dismiss for failure to state a claim, the District Court dismissed the complaint, holding that the language of the Agreement unambiguously excludes indemnification for claims arising out of the stock purchase transaction. The court also rejected the Nicolacis' common law indemnification claim. The Nicolacis timely appealed.

The District Court had jurisdiction under 28 U.S.C. § 1332 and we have jurisdiction pursuant to 28 U.S.C. § 1291.

**DISCUSSION**

**I.   STANDARD OF REVIEW**

We review de novo "a district court's allowance of a motion to dismiss for failure to state a claim." TAG/ICIB Servs., Inc. v. Pan Am Grain Co., Inc., 215 F.3d 172, 175 (1st Cir. 2000). We "accept as true the well-pleaded factual allegations of the complaint, draw all reasonable inferences therefrom in the plaintiff's favor, and determine whether the complaint, so read, sets forth facts sufficient to justify recovery on any cognizable theory." Id.

-4-

## II.  APPLICABLE LAW

"Federal courts sitting in diversity apply state substantive law and federal procedural rules." Correia v. Fitzgerald, 354 F.3d 47, 53 (1st Cir. 2003).  The parties agree that Massachusetts law applies to both the contractual and common law claims in this appeal.

## III. CONTRACTUAL INDEMNIFICATION

Contracts of indemnity are to be "fairly and reasonably construed in order to ascertain the intention of the parties and to effectuate the purpose sought to be accomplished." Shea v. Bay State Gas Co., 418 N.E.2d 597, 600 (Mass. 1981).  The Nicolacis contend that the Trustee's fraudulent transfer claim against them falls within the Agreement's indemnification clause and, alternatively, that the clause is ambiguous on this point. We find neither of these arguments persuasive. Reading the contract as a whole, including the indemnification clause, the release clause, and the exclusion of the date of execution of the stock purchase agreement from the indemnification clause, we conclude that the contract is unambiguous and the court was correct to enter judgment against the Nicolacis.

A.   The Language of the Indemnification Clause

The language of the Agreement limits indemnification to claims "which relate to or which arise or arose out of the business of Cliftex as operated prior to or after the date of this

Agreement."  The Nicolacis contend that the Trustee's claim relates to or arose out of Cliftex's business and offer four arguments in support:  (1) Cliftex and the Anapols were parties to the stock purchase agreement; (2) the Anapols and Cliftex benefitted from the stock purchase; (3) Cliftex funded the stock purchase; and (4) the Anapols' operation of Cliftex subsequent to the Agreement led to the bankruptcy and the fraudulent transfer claim.

The term "business," in its ordinary and common usage, refers to regularly repeated activity for profit.[1]  This definition is supported by Massachusetts case law, which has long defined "business," in considering what constitutes income, as "an activity which occupies the time, attention and labor of men for the purpose of livelihood, profit or gain."  Brown, Rudnick, Freed & Gesmer v. Bd. of Assessors of Boston, 450 N.E.2d 162, 164 (Mass. 1983); Whipple v. Comm'r of Corps. & Taxation, 161 N.E. 593, 595 (Mass. 1928).  The business of Cliftex, or the purpose which occupied its employees' time, attention and labor for livelihood, profit and gain, was the manufacture of clothing.  There may be scenarios in which a company's purchase of shares could come within the term "business as operated," however, here the purchase of shares was a

_____

[1]Black's Law Dictionary defines "business" as an "employment habitually engaged in for livelihood or gain."  BLACK'S LAW DICTIONARY 211 (8th ed. 2004)(emphasis added). Webster's defines "operation" as "a process or action that is part of a series in some work." WEBSTER'S NEW WORLD DICTIONARY 949 (3d College Ed. 1998).

one-time capital transaction unrelated to Cliftex's recurring and habitual operation of clothing manufacture.[2]  To the extent there is doubt about the content of the term "business as operated," it is resolved against the Nicolacis in light of the contract as a whole.

The Nicolacis' argument that because the Anapols and Cliftex benefitted from the purchase, it qualifies as the company's "business," is similarly unpersuasive.  If the company had no hope of deriving any benefit from a transaction that may be evidence that the transaction is not part of the business operation.  But the reverse is not true, as the discussion above indicates.

The argument that the Trustee's claims arise out of Cliftex's business as operated because the Anapols' operation of Cliftex subsequent to the Agreement led to the bankruptcy and, therefore, to the Trustee's claim, lacks logic.  The Trustee's claim regarding the stock purchase as a fraudulent transfer "relates to" and "arose out of" the execution of the stock purchase

---

[2]Massachusetts courts have noted the distinction, in the tax context, between capital transactions and business transactions. See Comm'r of Corps. & Taxation v. Filoon, 38 N.E.2d 693, 700 (Mass. 1941) (listing capital transactions and ordinary operations as distinct sources of profit); Follett v. Comm'r of Corps. & Taxation, 166 N.E. 575, 576-77 (Mass. 1929) (same).  A corporation's repurchase of its own stock would not be considered part of its ordinary business operations under either the common usage of the term or as Massachusetts courts have interpreted such language.  See Brown, 450 N.E.2d at 164; Filoon, 38 N.E.2d at 700; Follett, 166 N.E. at 576-77.

itself.  If the Agreement constituted a fraudulent transfer, it became such immediately upon execution.  The indemnification clause itself expressly excludes claims on the date of the stock purchase agreement, furthering our understanding that the clause did not cover the repurchase agreement.  While it is true that the Trustee's fraudulent transfer claim arose during and in the context of the bankruptcy proceeding, the claim against which the Nicolacis seek indemnification is that the transaction at issue, not the prior or subsequent operations of the business, defrauded Cliftex's creditors.  Further, as discussed below, the release clause is most consistently read with the indemnification clause to exclude claims arising from the stock repurchase.

B.    The Agreement Is Not Ambiguous

Under Massachusetts law, contract interpretation is a question of law for the court unless the contract is ambiguous.  See Coll v. PB Diagnostic Sys., 50 F.3d 1115, 1122-23 (1st Cir. 1995); Edmonds v. United States, 642 F.2d 877, 881 (1st Cir. 1981). A contract is ambiguous if "an agreement's terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of the words employed and obligations undertaken."  Lohnes v. Level 3 Communications, Inc., 272 F.3d 49, 53 (1st Cir. 2001) (citation omitted).  The question whether a contract term is ambiguous is one of law for the court. Alison H. v. Byard, 163 F.3d 2, 6 (1st Cir. 1998); Allen v. Adage,

Inc., 967 F.2d 695, 698 (1st Cir. 1992).  Ambiguity is not created merely because the litigants disagree about the meaning of a contract.  See Byard, 163 F.3d at 6.

The Nicolacis contend, in the alternative, that whether the parties intended to exclude the stock purchase transaction from the indemnification clause is, at best, a question of fact.  They argue that the omission from the indemnification clause of specific language about claims arising from the Agreement raises an inference that such claims were intended to be covered because they are specifically excluded from the release clauses.

In interpreting contractual language, we consider the contract as a whole.  Its meaning "cannot be delineated by isolating words and interpreting them as though they stood alone."  Starr v. Fordham, 648 N.E.2d 1261, 1269 (Mass. 1995).  In the first paragraph of the "General Releases" clause, the Nicolacis agreed to release and discharge Cliftex and the Anapols from any and all existing claims, except for "any claims arising under this Agreement."[3]  It would be inconsistent for the parties to have preserved their rights to assert claims against each other arising from the Agreement, and at the same time for the Anapols to agree to indemnify the Nicolacis for such claims.  These clauses, read together, indicate the intent of the parties to leave in place all liability arising from the

_____

[3]There are two other exceptions, but they are not pertinent here.

-9-

Agreement itself. Far from being inconsistent, the clauses, taken together, reflect the parties' intent to exclude from the indemnification clause claims arising under the Agreement. The Trustee's claim, arising out of the allegedly fraudulent nature of the stock purchase transaction, is therefore not covered by the indemnification clause.

The Agreement's unambiguous language leaves no question of fact to be resolved, and the contract must be enforced according to its terms. See Edmonds, 642 F.2d at 881. We hold that, as a matter of law, the terms of the Agreement exclude indemnification for any liability arising out of the fraudulent transfer proceeding.

## IV. COMMON LAW INDEMNIFICATION

The Nicolacis argue that Massachusetts recognizes a common-law right to indemnity where an innocent or comparatively faultless party is held liable for another's wrongdoing. However, this common law indemnity doctrine has been recognized only in personal injury tort actions. See Decker v. Black & Decker Mfg. Co., 449 N.E.2d 641 (1983); Rathburn v. W. Mass. Elec. Co., 479 N.E.2d 1383 (1985). Massachusetts courts have not applied this doctrine to an alleged fraudulent transfer case.

The cases the Nicolacis cite do not state any general rules that establish or imply a duty to indemnify in the present circumstances. The cited cases address whether, in a personal injury suit, a tortfeasor may seek indemnification from a more

-10-

culpable tortfeasor. The Nicolacis concede that no Massachusetts case has applied the common law indemnity doctrine in the context of a fraudulent transfer proceeding. They rest their claim on the absence of cases precluding the doctrine from being applied to the present case.

The District Court appropriately dismissed this claim. Federal courts sitting in diversity should be cautious about "push[ing] state law to new frontiers." Kelly v. Marcantonio, 187 F.3d 192, 199 (1st Cir. 1999). See also Taylor v. Aetna Cas. & Sur. Co., 867 F.2d 705, 706 (1st Cir. 1989) (stating that plaintiffs who choose a federal forum for litigation of state law claims cannot expect the court to "blaze a new trail" (citation omitted)). In the absence of authority supporting a common law right to indemnity in fraudulent transfer cases, we find no basis for the Nicolacis' claim.

**CONCLUSION**

For the reasons stated, we affirm the judgment of the District Court dismissing the Nicolacis' action.

**AFFIRMED.**