**NOT FOR PUBLICATION**

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | | |
|---|---|---|
| In re: | ) | BAP No. NV-13-1330-JuHlPa |
| | ) | BAP No. NV-13-1338-JuHlPa |
| MEGA-C POWER CORPORATION, | ) | (cross appeals) |
| | ) | |
| Debtor. | ) | Bk. No. NV-04-50962-GWZ |
| _____ | ) | |
| | ) | |
| WILLIAM A. LEONARD, JR., | ) | |
| Liquidation Trustee for the | ) | |
| Mega-C Liquidation Trust, | ) | |
| | ) | |
| Appellant/Cross-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | M E M O R A N D U M[*] |
| JOSEPH PICCIRILLI, Trustee | ) | |
| of the Mega-C Second Amended | ) | |
| Shareholders' Trust, | ) | |
| | ) | |
| Appellee/Cross-Appellant. | ) | |
| _____ | ) | |

Argued and Submitted on September 18, 2014
at Las Vegas, Nevada

Filed - October 30, 2014

Appeal from the United States Bankruptcy Court
for the District of Nevada

Honorable Gregg W. Zive, Bankruptcy Judge, Presiding

_____

Appearances:    William M. Noall, Esq., of Gordon Silver, argued
                for appellant/cross-appellee William A. Leonard,
                Jr.; Alice Campos Mercado, Esq., of Lemons,
                Grundy & Eisenberg, argued for appellee/cross-
                appellant Joseph Piccirilli.

_____

[*] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

-1-

Before: JURY, HOULE,[1] and PAPPAS, Bankruptcy Judges.

This appeal and cross-appeal arise from contempt sanctions issued by the bankruptcy court against Joseph Piccirilli (Shareholders' Trustee or ST), trustee of the Second Amended and Restated Trust Agreement for the Benefit of the Shareholders of Mega-C Power Corporation (Mega-C or debtor).

The bankruptcy court found ST in contempt for violating its orders dated July 26, 2011, and June 1, 2012, both of which required him to turn over shares of Axion Power International, Inc. (Axion) as required under the terms of debtor's confirmed second amended plan (Plan) to William A. Leonard, Jr. (Liquidation Trustee or LT), trustee of the Mega-C liquidation trust. In considering the appropriate sanctions, the court rejected LT's request for damages based on the decline of the stock's value during the contempt period and reduced his request for over $100,000.00 in attorney's fees to $9,439.00.

On appeal, LT challenges the bankruptcy court's determination of the sanctions amount. In the cross-appeal, ST maintains that the court erred in finding him in contempt and thus the award of sanctions was improper. Finding no error, we AFFIRM.

## I. FACTS

In April 2004, Axion, along with two other creditors, filed an involuntary petition for relief under chapter 11[2] against

---

[1] The Honorable Mark D. Houle, U.S. Bankruptcy Judge for the Central District of California, sitting by designation.

[2] Unless otherwise indicated, all chapter and section
(continued...)

-2-

Mega-C. Mega-C consented to the entry of an order for relief, which the bankruptcy court entered on May 3, 2004. Within a few months, the court appointed William M. Noall[3] as the chapter 11 trustee. Early on, the bankruptcy court identified the bankruptcy proceeding as a classic "shareholders' dispute."

Before the petition date, Axion created a shareholders' trust (Shareholder Trust) under a trust agreement for the benefit of shareholders of Mega-C, containing 7,327,500 shares of Axion common stock (Axion Stock) for the benefit of debtor's creditors and equity security holders. After the petition date, the Shareholder Trust increased its holdings to 7,827,500 shares of Axion Stock under a first amended and restated trust agreement.

In December 2005, a settlement agreement (2005 Settlement Agreement) was reached to resolve a series of disputes and claims among a wide range of parties including, among others, the estate, through the chapter 11 trustee, Axion, and the Shareholder Trust. The 2005 Settlement Agreement set forth the terms of a proposed plan that was to be filed with the bankruptcy court. Among other things, the agreement provided that on the effective date (Effective Date) of the Plan, 5,700,000 shares of Axion Stock (the Plan Funding Shares) in the Shareholder Trust would be allocated to pay priority claims,

[2](...continued)
references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and "Rule" references are to the Federal Rules of Bankruptcy Procedure.

[3] Mr. Noall later became LT's attorney.

unsecured claims, and other expenses.

Before the Effective Date, Ms. Sally Fonner, the predecessor Shareholders' Trustee to Joseph Piccirilli, was authorized to liquidate up to 1,000,000 of the Plan Funding Shares for the purposes of paying the administration fees and costs of debtor's estate and providing the cash required to confirm the Plan. The 2005 Settlement Agreement further provided for the distribution of additional Plan Funding Shares to a liquidation trust (Mega-C Liquidation Trust) in the following manner:

> In the event the net liquidation proceeds of the shares of the Plan Funding Shares to be liquidated by Fonner prior to the Effective Date is inadequate to pay unclassified claims allowed prior to the Effective Date, unclassified claims (including 326 Fees) not yet allowed, allowed priority and unsecured claims to be paid on the Distribution Date and any disputed claims reserve, the [LT] may immediately commence the orderly liquidation of sufficient Plan Funding Shares to satisfy such claims and reserves. Sufficient shares of Plan Funding Shares for this purpose shall be determined based upon the average closing bid price of Axion stock for the thirty (30) trading days immediately prior to the Effective Date . . . .

Finally, the agreement provided for the formation of the Mega-C Liquidation Trust and the amendment and restatement of the Shareholder Trust by a second amended and restated trust agreement (as amended, the Shareholders' Trust Agreement).

The plan, which incorporated the 2005 Settlement Agreement, was subsequently filed in the bankruptcy court. On November 8, 2006, the bankruptcy court confirmed the Plan with an Effective Date of November 21, 2006. Before the Effective Date of the Plan, Axion shares were trading at a little over $2.00 per share.

-4-

On the Effective Date, the Mega-C Liquidation Trust agreement (Liquidation Trust Agreement) and Shareholder Trust agreement were executed, thereby creating the liquidating trust and providing for the funding of the Mega-C Liquidation Trust in substantially the same manner as set forth in the Plan, and Leonard was appointed the LT. Distribution of the Plan Funding Shares in accordance with the Plan and the Shareholder Trust agreement was identified as one of the explicit powers of the ST.

After the Effective Date, Plan Funding Shares were transferred to the Mega-C Liquidation Trust. However, LT subsequently learned that some shares were sold while others were unaccounted for. Furthermore, LT's records showed that $321,551.45 in administrative claims and $455,600.00 in allowed general unsecured claims remained unpaid. The Mega-C Liquidation Trust also incurred $1,238,789.39 through February 28, 2011 in post-Effective Date trust expenses that remained unpaid as of April 7, 2011. These expenses were partially related to an adversary proceeding pursued by the chapter 11 trustee, and then by LT, against Fogler Rubinoff, a law firm that formerly represented debtor (Fogler Rubinoff Litigation).[4] Although the Mega-C Liquidation Trust held

---

[4] The complaint against Fogler, filed in May 2006, asserted claims for breach of fiduciary duty, negligence and breach of contract. In November 2009, the bankruptcy court held a multi-day trial and then took the matter under submission. The court issued its findings of fact and conclusions of law and judgment in late September 2012. The judgment required Fogler to disgorge fees of over $277,000.00 but the court found Fogler had no
(continued...)

$41,286.26 in assets available for distribution on the unpaid claims, this amount was inadequate to pay the claims and liquidating trust expenses.

In mid-November 2010, LT sent a demand letter to the then acting ST, Mark Dolan, demanding that he take any and all actions necessary to assure that the Shareholder Trust transfer the remaining Plan Funding Shares to the Mega-C Liquidation Trust to satisfy the requirements of the Plan. LT stated his intent to sell the remaining Plan Funding Shares solely to the extent necessary to raise sufficient proceeds to pay all unpaid claims and trust expenses. Dolan died on March 15, 2011, without complying with the demand.

## A. The July 2011 Order

Having received no response to his demand letter, on April 7, 2011, LT filed a motion to compel the turnover of all remaining shares of Axion Stock. Twenty days later, Piccirilli was named the ST.

ST then opposed in part LT's motion to compel. ST did not oppose releasing sufficient shares to pay the remaining fees owed under the Plan to certain parties listed in LT's motion. However, ST conditioned the release of additional shares on a complete accounting of all trust expenses incurred (regardless of whether or not already paid) and the bankruptcy court's determination that the fees and expenses were reasonable in light of the outcome of the Fogler Rubinoff Litigation. ST also

----

[4](...continued)
liability for the conduct alleged.

requested the bankruptcy court to establish a mechanism for the measured liquidation of the shares. This request was based on ST's belief that liquidating all the shares at once would dilute their value.

In reply, LT maintained that he had no fiduciary duty to the Shareholder Trust and that the reasonableness of the fees incurred was not a condition precedent to the Shareholder Trust's turnover of the Plan Funding Shares. LT also argued that ST's request for the measured liquidation of the Axion Stock was nothing more than an attempt to rewrite and renegotiate the terms of the Plan and Mega-C Liquidation Trust.

At the June 6, 2011 hearing, the bankruptcy court noted that the provisions of the Plan and the trust agreements required ST to turn over the Plan Funding Shares to LT at LT's request. Accordingly, the bankruptcy court ordered ST to turn over the remaining shares to LT stating "[t]hat should happen as soon as possible."

On July 26, 2011, the court entered the order directing ST to transfer the remaining Plan Funding Shares to LT (the July 2011 Order), which order states in part:

> The [s]hareholders' trustee is hereby ordered to immediately transfer the Remaining Plan Funding Shares from the Shareholder[] Trust to the Liquidation Trustee for liquidation to fund payment of Unpaid Claims and Trust Expenses.

ST did not seek to modify the July 2011 Order in any manner, or to appeal the order, and the order became final.

**B.    The October 2011 Agreement**

After the June 6, 2011 hearing, ST and LT entered into negotiations to facilitate the transfer and liquidation of Axion

Stock necessary to satisfy the terms of the July 2011 Order. A preliminary agreement required ST to transfer the remaining Plan Funding Shares to a brokerage account within five days after the parties executed the agreement, provided for an orderly liquidation of the Plan Funding Shares over several months, and required ST to make varying monthly cash payments to LT if the liquidation of the stock resulted in less than designated amounts.[5] In essence, ST was required to transfer the shares to a brokerage account under the control of LT, but ST would control the sales of the shares over several months for the purpose of making the cash payments. If ST breached the agreement, then he would lose his ability to trade the shares.

The parties continued their negotiations regarding the transfer and orderly liquidation of the shares after the bankruptcy court entered the July 2011 Order. During the negotiations, ST liquidated shares and distributed $100,000.00 to LT's attorney at Gordon & Silver and $31,850.03 to ST's attorney, Jeffery Hartman.

Concerned that an agreement would never be reached, on October 11, 2011, LT filed his first motion for order to show cause (OSC) why Plan Funding Shares have not been turned over under the July 2011 Order. Some version of an agreement was executed by ST on October 31, 2011 (the October 2011 Agreement), the day of the scheduled hearing on the OSC. At the hearing, the parties explained that they had reached a resolution

---

[5] $200,000 was to be paid by November 28, 2011; $400,000 by December 22, 2011, and $800,00 by January 27, 2012.

-8-

regarding the OSC under the terms of the October 2011 Agreement.

In reality, however, the agreement was not yet finalized. It was not until December 2011 that the parties agreed to the final terms. On December 21, 2011, signatures for the final version of the agreement were exchanged by e-mail. The record shows that the parties never sought court approval of this agreement despite the fact that it was inconsistent with the July 2011 Order in that it did not require ST to immediately turn over the shares to LT. By its terms, the agreement required ST to turn over all remaining shares to a brokerage account under the control of LT no later than December 26, 2011, which he did not do. ST also failed to make the cash payment required by the agreement on January 2012.

**C.   The June 2012 Order**

In late February 2012, LT filed a second motion for an OSC seeking ST's compliance with the July 2011 Order and October 2011 Agreement. ST did not respond to the motion, but Axion filed an opposition arguing for an orderly liquidation of the shares.

At the May 29, 2012 hearing, the bankruptcy court noted that ST was told in July 2011 to turn over the shares and he had not done so, nor did he seek any relief from the court's July 2011 Order. Moreover, although the court had not yet issued its decision on the Fogler Rubinoff Litigation, the court observed there was no change in circumstances since its July 2011 Order. The court questioned ST's attorney Mr. Hartman why ST had not yet turned over the shares. Mr. Hartman replied: "Well, your Honor, I will instruct Mr. Piccirilli tomorrow morning to take

the necessary steps to deliver the funding shares to Gordon & Silver . . . ." In the end, the court stated that it was going to enter an order "confirming my earlier order requiring that all the Plan Funding Shares be turned over to the Liquidation Trust." The court also told Mr. Hartman that ST should turn over the shares by 2:00 p.m. on June 1, 2012 and that a full accounting should be provided by June 29, 2012.

On June 1, 2012, the bankruptcy court entered the order granting LT's motion which required ST to transfer all the Plan Funding Shares no later than 2:00 p.m. on June 1, 2012, and provide a full accounting to the LT no later than close of business on June 29, 2012 (June 2012 Order). The order further stated that the matter of sanctions against ST for violation of the July 2011 Order was not before the court.

On June 22, 2012 — three weeks after he was ordered to do so — ST transferred the remaining Plan Funding Shares to LT, along with $13,948.19 in cash. LT sold the shares over a thirty-day period, netting $619,241.28 for an average price of $.305447 per share.

On June 29, 2012, ST filed brokerage account statements for the Shareholder Trust. These statements showed checks by number and the amount written from the account. The realized gains/losses section of each statement showed the sales of Axion Stock by date, quantity, sale price per share and proceeds received for each stock sale. The statements did not identify who received the cash payments.

**D.    The Ex Parte Application For OSC**

In late July 2012, LT filed an ex parte application seeking

-10-

a full and complete accounting and sanctions. On August 17, 2012, the bankruptcy court issued an OSC, which states in relevant part:

> [Mr. Piccirilli] is ordered by this Court to personally appear before this Court on September 27, 2012 at 2:00 p.m. to show cause why he should not be sanctioned for not filing with the Court and providing the Liquidation Trustee:
>
> 1. A full and complete accounting, including all backup Records . . . of his activities as the Shareholder Trustee from the date of his appointment as the successor Shareholder Trustee by order of the Court entered on April 27, 2011, including the receipt, management, and disposition of Plan Funding Shares, as well as the use of proceeds from any such disposition; and
>
> 2. Any and all other records, . . . in his possession or accessible to him evidencing the receipt, management, and disposition of Plan Funding Shares including the use of all proceeds from any such disposition by the prior trustees of the Shareholder Trust.

On September 25, 2012, the bankruptcy court held a hearing regarding ST's request for a continuance of the matter and stated that it would conduct a hearing regarding the request for sanctions. On the same day, ST filed his declaration with an accounting and back-up documents. The court scheduled the sanctions hearing for November 15, 2012.

**E.    The November 15, 2012 Hearing**

On October 18, 2012, LT filed a supplement to his ex parte application requesting $1,711,740.40 in sanctions due to ST's noncompliance with the July 2011 and June 2012 Orders. That amount was comprised of $141,010.96 for attorney's fees and costs incurred from April 26, 2011, through October 15, 2012, and $1,570,729.44 for damages resulting from the delayed sale of the Plan Funding Shares, on the basis that the Axiom Stock had

-11-

declined in value.  LT calculated the damages related to the delayed sale of the stock under a date of loss and averaging methodology set forth in U.S. v. Gordon where the district court had used this method to award restitution in a criminal case involving the embezzlement of stock.  393 F.3d 1044, 1151-55 (9th Cir. 2004).

In response, ST argued against the requested sanctions on the grounds that:  (1) the only order LT ever attempted to enforce was the June 2012 Order; (2) LT filed his motion to compel transfer of the shares before ST was even appointed; (3) after the bankruptcy court entered the July 2011 Order, the parties negotiated the October 2011 Agreement for the transfer and orderly liquidation of the stock which superceded the court's July 2011 Order; and (4) he substantially complied with the June 2012 Order by transferring the shares on June 22, 2012, and filing the account statements.

At the hearing on sanctions, ST testified that after he became the trustee, he believed he had an obligation to transfer the Plan Funding Shares when LT requested him to do so.  He also testified that under the October 2011 Agreement, the deadline to transfer the shares was in December 2011.  ST admitted that he did not transfer the shares in accordance with the October 2011 Agreement, but conceded that he had no good answer why he did not do so.  Later, ST testified that the reason he did not turn over the shares was his hope that the Fogler Rubinoff Litigation would be resolved before the hearing on the sanctions and that such resolution would have provided cash to LT in lieu of liquidating Axion Stock.  He then admitted that he did not

believe the resolution of the Fogler Rubinoff Litigation would absolve him of his obligation to turn over the shares.

The bankruptcy court stated at the hearing that it understood that the shares were not turned over earlier because of the October 2011 Agreement.  However, the court stated that once the agreement was not fulfilled, "there is no doubt in my mind that those shares of stock should have been turned over and not just relying on some hope that Fogler Rubinoff Litigation might be decided, because even if it was . . . it would have no real determinative effect on the turnover of the stock."  The bankruptcy court determined that damages arising out of the contempt would not be awarded for the period before January 2012 because the parties "reset the clock" by entering into the October 2011 Agreement.  The court requested the parties to file supplemental briefs on the issue of damages, fees, and costs.

LT filed his supplemental brief, arguing that under the Gordon methodology the proper period for the date of loss spanned from January 10, 2012, through February 20, 2012.  LT explained that ST executed the October 2011 Agreement on December 21, 2011, and thus he was required to distribute the shares no later than December 26, 2011.  LT maintained that due to the holidays, he would not have started selling the shares until January 10, 2012.  He also asserted that the date of loss should span thirty trading days through February 20, 2012. Based on this period, under the methodology in Gordon, LT asserted that his damages were $495,254.25 from the delayed sale of the shares.  In addition, LT requested $104,496.45 in attorney's fees and expenses for the time period January 10,

-13-

2012 through November 29, 2012.

ST then filed his supplemental brief, arguing that stock price damages were unwarranted and unproven. ST pointed out that the Plan set aside a finite number of Axion shares to be available to pay claims and administrative expenses, but it did not identify a specific value or required amount that these shares would bring. ST also maintained that LT failed to establish that ST intended to delay delivery of the shares; rather, his only motive was to attempt to preserve value for the shareholders of Axion. ST asserted that there was no evidence that the sales would have occurred if the shares were turned over in December 2011 as required. Finally, ST maintained that the alleged loss of value of the stock as a basis for sanction was unsupported by the law and was an inappropriate measure of damages based upon a false assumption that the shares would have been sold on a straight-line basis over thirty trading days.

ST argued that sanctions, if any, should be limited to the costs and attorney's fees incurred for enforcing the turnover obligations by motion in June 2012. ST noted that the total attorney's fees requested by LT were related to three large categories of work: first, fees for researching and preparing the motion and the reply, and for appearing at the hearing on an unopposed 2012 turnover motion; second, fees for researching and preparing the reply to the ex parte application for OSC regarding the accounting issues, filed after ST filed his account statements; and third, fees for researching and preparing the motion and reply regarding the supplement to ex parte application for OSC regarding the accounting issue.

ST argued that neither of these last two categories should form the basis for sanctions for violation of the turnover orders. Specifically, the second category dealt with a challenge to the accounting contained in the account statements which, according to ST, the court rejected as a basis for sanctions and the third category was based upon the ex parte application regarding the accounting issues in which counsel asserted claims for sanctions on the turnover issue even though the turnover occurred four and a half months earlier.

In the end, ST asserted that, as in Dyer, sanctions should not be awarded for unsuccessful motions or for fees incurred for motions unrelated to the performance the court had already compelled.

**F.   The February 13, 2013 Hearing**

At the February 13, 2013 hearing on sanctions, the bankruptcy court stated that it had some concern about applying the Gordon rationale for full restitution in a criminal case to a contempt case when there were limitations on the ability of the bankruptcy court to impose monetary sanctions for contempt. The court also noted that the methodology in Gordon was only "one methodology" and that it was complex.

At another point, the court found ST's explanation for his failure to turn over the shares based on the outcome of the Fogler Rubinoff Litigation unreasonable "because it did not affect his obligation to turn it over."

ST's attorney also spent considerable time reviewing the requested attorney's fees and costs, pointing out discrepancies along the way, and argued that the only fees related to the

-15-

June 2012 motion and related order totaled $9,400, not $36,069 as sought by LT.

The court also questioned LT's counsel regarding the scope of the damages:

> THE COURT: Your position is none of this would have been necessary but for Mr. Piccirilli's failure to comply with the terms of the October 2011 agreement.
>
> MR. NOALL: Yes
>
> THE COURT: Which also kept in effect the order that I entered in 2011.
>
> MR. NOALL: Expressly so in paragraph 11.
>
> THE COURT: That's what I understand your position [is] . . .

At the end of the hearing the court took the matter under submission.

**G.    The Bankruptcy Court's Ruling**

On June 28, 2013, the bankruptcy court issued its findings of fact and conclusions of law. The court found that ST had violated the court's July 2011 Order by failing to turn over the Plan Funding Shares to LT in accordance with that order, and that ST had violated the June 2012 Order by failing to turn over the shares by the deadline contained in the order. The court further found that:

> Both Orders clearly command the Shareholders' Trustee to immediately turn over the Plan Funding Shares to the Liquidation Trustee. Mr. Piccirilli failed to substantially comply with either of the Court's Orders. Mr. Piccirilli's actions were not based on good faith or a reasonable interpretation. Instead, Mr. Piccirilli acted in bad faith by not complying with either Order. The Court finds clear and convincing evidence that Mr. Piccirilli willfully violated both Orders and should be held in contempt.

In determining the amount of the sanctions, the bankruptcy court

-16-

decided that the test set forth in Gordon was inapplicable because that case involved criminal embezzlement and a restitution calculation, while ST's delay in turning over the Plan Funding Shares was not criminal.

The bankruptcy court then limited the sanctions to LT's reasonable attorney's fees and costs incurred in bringing and enforcing LT's second motion for OSC that resulted in the June 2012 Order. In evaluating the requested fees for that time period, the bankruptcy court concluded that certain fees were not related to the turnover of the shares and other fees were excessive. In the end, the court found the amount of $9,439.00[6] was appropriate. The court also noted that ST would have to pay his own attorney's fees for the litigation. The court found that those fees, plus the sanction award of $9,439.00, were sufficient and appropriate sanctions for ST's wrongful conduct.

The bankruptcy court entered the order consistent with its decision on June 28, 2013. LT filed a timely notice of appeal on July 12, 2013. ST filed a timely notice of his cross-appeal on July 15, 2013, which was subsequently amended on July 19, 2013.

## II.  JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(A). We have jurisdiction under 28 U.S.C. § 158.

---

[6] Of this amount, $3,651.00 was for Mr. Gordon's time on May 23 and May 28 preparing for the May 29, 2012 hearing on the OSC; $5,168.00 was for Mr. Gordon's time spent at the May 29, 2012 hearing; and $620.00 was for Mr. Gordon's time spent preparing the June 2012 Order.

## III. ISSUES

On appeal, we consider whether the bankruptcy court erred in calculating the sanctions by (a) refusing to apply the remedial methodology announced in Gordon, or another similar methodology, to determine the proper measure of damage caused by ST's failure to distribute Plan Funding Shares in accordance with the court's orders; (b) limiting the award of sanctions to LT's reasonable costs and attorney's fees for work directly related to the June 2012 Order; and (c) reducing the amount of attorney's fees for this time period.

In the cross-appeal, we consider whether the bankruptcy court erred by finding ST in contempt of the July 2011 Order and the June 2012 Order.

## IV. STANDARDS OF REVIEW

We review the bankruptcy court's determination of contempt for an abuse of discretion. Price v. Lehtinen (In re Lehtinen), 332 B.R. 404, 411 (9th Cir. BAP 2005), aff'd, 564 F.3d 1052 (9th Cir. 2009). We also review the court's determination to impose sanctions for contempt for an abuse of discretion. See Hansbrough v. Birdsell (In re Hercules Enters., Inc.), 387 F.3d 1024, 1027 (9th Cir. 2004).

In determining whether the bankruptcy court abused its discretion we first determine de novo whether the trial court identified the correct legal rule to apply to the relief requested and then, if the correct legal standard was applied, we determine whether the court's application of that standard was "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record."

United States v. Loew, 593 F.3d 1136, 1139 (9th Cir. 2010).

We review for clear error the bankruptcy court's findings of fact in connection with the contempt order. F.T.C. v. Affordable Media, LLC, 179 F.3d 1228, 1239 (9th Cir. 1999). A court's findings of fact are clearly erroneous if they are illogical, implausible, or without support in the record. Retz v. Sampson (In re Retz), 606 F.3d 1189, 1197 (9th Cir. 2010). "Clear error exists only when the reviewing court is left with a definite and firm conviction that a mistake has been committed." Computer Task Group, Inc. v. Brotby (In re Brotby), 303 B.R. 177, 184 (9th Cir. BAP 2003). "If two views of the evidence are possible, the trial judge's choice between them cannot be clearly erroneous." In re Lehtinen, 332 B.R. at 411.

## V. DISCUSSION

### A. Contempt And Sanctions: Legal Standards

Bankruptcy courts have the power to issue sanctions under their civil contempt authority under § 105(a)[7] and their inherent sanction authority. In re Lehtinen, 564 F.3d at 1058. The bankruptcy court's inherent authority differs from the court's civil contempt power under § 105(a) and the two are not

_____

[7] Section 105(a) provides:

The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

-19-

interchangeable. Knupfer v. Lindblade (In re Dyer), 322 F.3d 1178, 1196 (9th Cir. 2003). The inherent power allows the court to sanction a broad range of conduct, unlike the civil contempt authority, which permits a court to remedy a violation of a specific order. Id. Further, unlike the civil contempt authority, a bankruptcy court must make an explicit finding of bad faith or willful misconduct before imposing sanctions under its inherent authority. In re Lehtinen, 564 F.3d at 1058.

Whether acting under its inherent authority or civil contempt authority, the bankruptcy court does not have authority to impose significant punitive damages. Id. at 1059. "Civil penalties must either be compensatory or designed to coerce compliance." Id. Although the Ninth Circuit has never "'develop[ed] . . . a precise definition of the term "serious" punitive (criminal) sanctions,' it has stated that a penalty is criminal in nature 'if the contemnor has no subsequent opportunity to reduce or avoid the fine through compliance, and the fine is not compensatory.'" Id. It is also criminal if the sanction was intended "'to vindicate the authority of the court.'" Id. However, actual damages, including attorney's fees incurred as a result of the noncompliant conduct, can be recovered as part of a compensatory civil contempt sanctions award. See In re Dyer, 322 F.3d at 1195. To award such sanctions, the bankruptcy court must find that actual damages flowed from the contemnor's noncompliant conduct. Id.; see also Shuffler v. Heritage Bank, 720 F.2d 1141, 1148 (9th Cir. 1983) (Compensatory contempt sanctions must be based on "actual losses sustained as a result of the contumacy.").

-20-

Here, it appears the bankruptcy court invoked its inherent power to sanction by making findings of bad faith and invoked its civil contempt power under § 105(a) by applying the standards for civil contempt. "The standard for finding a party in civil contempt is well settled: The moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court. The burden then shifts to the contemnors to demonstrate why they were unable to comply." Affordable Media, 179 F.3d at 1239; Renwick v. Bennett (In re Bennett), 298 F.3d 1059, 1069 (9th Cir. 2002). In other words, the contemnor may purge the contempt by showing that it was impossible to comply. "Where compliance is impossible, neither the moving party nor the court has any reason to proceed with the civil contempt action." United States v. Rylander, 460 U.S. 752, 757 (1983).

Substantial compliance is also a defense to civil contempt. Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc., 689 F.2d 885, 891 (9th Cir. 1982). "Technical or inadvertent violations of the order" are not fatal to a substantial compliance defense where the party "has taken 'all reasonable steps' to comply with the court order. . . ." Gen. Signal Corp. v. Donallco, Inc., 787 F.2d 1376, 1379 (9th Cir. 1986). To show substantial compliance, the contemnor must come forward with evidence that he has taken all reasonable steps within his power to comply with the court's order. Go-Video, Inc. v. Motion Picture Ass'n of Am. (In re Dual-Deck Video Cassette Recorder Antitrust Litig.), 10 F.3d 693, 695 (9th Cir. 1993). Such evidence must be credible under the circumstances, for a contemnor cannot

-21-

satisfy his burden of production "by evidence or by his own denials which the court finds incredible in context." Maggio v. Zeitz, 333 U.S. 56, 75–76 (1948). The contemnor must show "'categorically and in detail' why he is unable to comply." Affordable Media, 179 F.3d at 1241.

Finally, civil contempt "'need not be willful,' and there is no good faith exception to the requirement of obedience to a court order. [However], a person should not be held in contempt if his action 'appears to be based on a good faith and reasonable interpretation of the [court's order].'" Go–Video, 10 F.3d at 695.

In light of the above-referenced standards, our first task is to determine whether the bankruptcy court could properly determine that (1) ST violated the court orders at issue, (2) beyond substantial compliance, (3) not based on a good faith and reasonable interpretation of the orders, and (4) by clear and convincing evidence. Go–Video, 10 F.3d at 692; see also Dardashti v. Golden (In re Dardashti), 2008 WL 8444787, at *7 (9th Cir. BAP February 12, 2008). If the bankruptcy court's finding of contempt was proper, we then consider whether the bankruptcy court abused its discretion in determining the sanction amount.

**B.   The Bankruptcy Court Did Not Clearly Err In Finding ST In Contempt Of the July 2011 Order And The July 2012 Order.**

**1.   The July 2011 Order.** ST argues that none of the Go–Video factors are met with respect to the July 2011 Order. First, he contends that he did not violate the July 2011 Order because it was superceded by the parties' October 2011

Agreement. In this regard, ST relies on the bankruptcy court's tentative comments at the November 15, 2012 hearing which suggested that the October 2011 Agreement superseded the July 2011 Order. Second, ST asserts that he reasonably and in good faith relied on the October 2011 Agreement, which essentially modified the terms of the bankruptcy court's July 2011 Order. Next, ST maintains that he did not disobey the July 2011 Order or fail to deliver the shares in bad faith or for any improper purpose. Finally, ST asserts that to the extent the bankruptcy court's sanction order was based upon his non-compliance with the October 2011 Agreement, it was error, as non-compliance with an agreement does not constitute the willful disobedience of a court order.

These arguments are not persuasive. At the May 29, 2012 hearing, the bankruptcy court noted that ST was told in July 2011 to turn over the shares and he had not done so, nor did he seek any relief from the court's July 2011 Order. In other words, the court implicitly recognized that its July 2011 Order was final and therefore fully enforceable. Further, the bankruptcy court's comments at the November 15, 2012 hearing did not constitute its findings of fact with respect to ST's contempt for violating the July 2011 Order. Indeed, at that hearing the court stated that in its mind once the October 2011 Agreement was not fulfilled, the stock should have been immediately turned over. Again, the court implicitly recognized that its July 2011 Order was in effect.

Later at the February 13, 2013 hearing on sanctions, the record shows that the bankruptcy court was still considering

-23-

LT's position that the damages would not have occurred "but for" ST's failure to comply with the terms of the October 11 Agreement which "kept in effect" the July 2011 Order. In this regard, LT pointed out that the October 11 Agreement referenced the bankruptcy court's July 2011 Order in Recital B and defined it as the "Court Order." Recital D states that the parties were entering into the agreement to "facilitate the transfer and liquidation of the shares necessary to satisfy the terms of the Court Order." Paragraph 11 further provides:

> Court Order and Bankruptcy Court Jurisdiction. Except as otherwise expressly provided by this Agreement, all of the Shares that have not been sold by LT shall be under the control of LT, consistent with the Court Order and the Plan. Nothing in this Agreement shall be deemed or construed as affecting the validity or enforceability of the Court Order or impairing the jurisdiction of the Bankruptcy Court to enforce the Court Order or to resolve any issue with regard to the Shares.

Nowhere does the agreement explicitly state that it superceded the July 2011 Order. Instead, the plain language of the above-cited provisions indicates the parties' intent that the July 2011 Order would remain valid and enforceable.

That order, in no uncertain terms, required ST to turn over the shares. It follows that if the terms of the agreement were not fulfilled, the July 2011 Order controlled. In sum, ST's subjective belief that the October 2011 Agreement somehow superceded the bankruptcy court's July 2011 Order was not a legal justification for his disobedience of the court's July 2011 Order.

Moreover, the Plan specifically required ST to turn over the shares when LT requested him to do so. Thus, even before

-24-

the bankruptcy court entered the July 2011 Order, ST knew he had to turn over the shares to comply with the Plan as demonstrated by his testimony at the November 15, 2012 hearing; i.e., after he became the trustee, he believed he had an obligation to transfer the Plan Funding Shares when requested to do so by LT. Accordingly, the July 2011 Order was simply consistent with ST's existing obligations under the Plan, which were known to him.

We are also not persuaded by ST's argument that he was somehow improperly held in contempt for breaching the October 2011 Agreement. The bankruptcy court did not mention in its findings of fact or conclusions of law that ST's breach of the October 2011 Agreement was the basis for finding ST in contempt. Although the court acknowledged that the agreement "reset the clock" as far as LT's damages, the bankruptcy court never explicitly found that the agreement replaced its July 2011 Order.[8]

Finally, ST contends his failure to comply with the court's July 2011 Order was not in "bad faith" or "willful." With respect to civil contempt matters there is no requirement that the contempt be willful and there is no good faith exception to the requirement of obedience to a court order. See Go-Video, 10 F.3d at 695. "Intent is irrelevant to a finding of civil contempt and, therefore, good faith is not a defense." Stone v.

_____

[8] We note that even if the October 2011 Agreement was modified or became a substitute for the July 2011 Order, ST failed also to comply with its deadlines. This failure would have also provided a factual basis for the finding of contempt. ST's arguments, therefore, are a distinction without a difference.

-25-

City & Cnty. of S.F., 968 F.2d 850, 862 (9th Cir. 1992).

In any event, we conclude that the bankruptcy court's finding of bad faith was not error. The record shows that ST never provided a satisfactory reason why he did not turn over the stock to LT in compliance with the July 2011 Order even after he breached the October 2011 Agreement. At the November 15, 2012 evidentiary hearing, ST admitted that he did not transfer the shares pursuant to the agreement, but stated that he had no good answer as to why he did not do so. Later, ST testified that the reason he did not turn over the shares was his hope that the Fogler Rubinoff Litigation would be resolved in favor of the estate before the hearing and would provide cash to LT in lieu of liquidating Axion Stock. He then stated that he did not believe the resolution of the Fogler Rubinoff Litigation would absolve him of his obligation to turn over the shares. At the February 13, 2013 hearing on sanctions, the bankruptcy court found that it was unreasonable for ST to "hope" the Fogler Rubinoff Litigation would somehow relieve him of his duty to turn over the stock which was required by the confirmed Plan and the court's July 2011 Order. Based on these facts, and all reasonable inferences from these facts, the bankruptcy court could properly conclude that ST acted in bad faith when he failed to turn over the shares. "If two views of the evidence are possible, the trial judge's choice between them cannot be clearly erroneous." In re Lehtinen, 332 B.R. at 411.

In sum, we find nothing in the record to support ST's arguments. Therefore, the bankruptcy court did not clearly err by finding ST in contempt for violating the July 2011 Order.

-26-

**2.    The June 2012 Order.**  ST also contends that the bankruptcy court erred by finding him in contempt of the July 2012 Order because he substantially complied with the order.  ST maintains that once he found out about the order, he promptly obeyed it by immediately directing the custodian of the stock to deliver the shares to the new custodial account that LT had set up and executing all documents for the transfer in a timely manner.  In essence, ST asserts that there was nothing else he could do to effectuate the transfer by the June 1, 2012 deadline set forth in the order.

ST's claim of substantial compliance is unpersuasive.  ST had the burden of producing evidence showing that he had taken all reasonable steps within his power to comply with the court's order to prove the defense.  Go-Video, 10 F.3d at 695.  In assessing whether an alleged contemnor has taken "every reasonable step" to comply with the terms of a court order, the bankruptcy court can consider (1) a history of noncompliance and (2) a failure to comply despite the pendency of a contempt motion.  See Stone, 968 F.2d at 857.  Here, the record shows that ST had a history of noncompliance with respect to transferring the shares to LT.  Despite the plain language of the Plan, the bankruptcy court's July 2011 Order, and the October 2011 Agreement — all of which required him to transfer the shares in a timely manner — he never did so.  Moreover, when LT filed the second motion for an OSC, ST still did not comply.

Finally, the record shows that the bankruptcy court informed ST's attorney at the May 29, 2012 hearing on LT's second motion for OSC that ST should turn over the shares by

-27-

2:00 p.m. on June 1, 2012. ST never moved for an extension of time based on his after-the-fact argument that it was impossible for him to comply. Rather, he transferred the shares to LT three weeks later. Although ST argues that he did all that he could do, there is no evidence in the record that compliance by the June 1, 2012 date was impossible. Affordable Media, 179 F.3d at 1241 (contemnor must show "'categorically and in detail' why he is unable to comply."). Given the absence of such evidence, we cannot say the bankruptcy court's interpretation of the facts and finding of contempt was implausible on its face. As fact finder, the bankruptcy court was in the best position to determine ST's credibility about what steps he had taken to comply with the court's order and whether those steps were reasonable under the circumstances. See Maggio, 333 U.S. at 75-76 (evidence of what reasonable steps were taken must be credible under the circumstances).

In short, on this record, we are not left with a firm and definite conviction that a mistake has been made. Accordingly, we discern no error with the bankruptcy court's decision finding ST in contempt of the June 2012 Order.

**C. The Bankruptcy Court Did Not Abuse Its Discretion In Awarding Sanctions Of $9,439.00.**

**1. The Gordon Methodology.** LT first argues that the bankruptcy court erred in rejecting the methodology in Gordon as an appropriate measure of damages caused by ST's failure to distribute the shares in accordance with the bankruptcy court's orders. We disagree.

The Gordon case arose in the context of the Mandatory

-28-

Victims Restitution Act. In re Gordon, 393 F.3d at 1049. There, the defendant worked at Cisco from 1995 through 2011. In 1995, Cisco had acquired 896,834 shares of a corporation called Terayon. In 1998, without the company's knowledge, Gordon sold short 54,525 of Cisco's Terayon shares. Then, in June 1999, Gordon embezzled another 100,000 Terayon shares from Cisco's account without Cisco's knowledge. From July 21, 1999, through March 6, 2011, Cisco sold all of its Terayon shares (excluding the Gordon shares it did not know were missing). The district court found Cisco would have sold the Gordon shares as well had Gordon not wrongfully taken them without Cisco's knowledge.

In determining the proper method of restitution, the district court first had to determine the date of loss. The court noted that the date of loss is the date on which the shares would have been sold. However, Cisco disposed of the shares over the course of twenty-one months and, therefore, the district court concluded that the date of loss was the entire period in which Cisco was disposing of the Terayon shares. To determine a proper restitution amount based on this range of dates, the district court computed the loss by using the average closing price of Terayon shares from July 21, 1999 through March 6, 2001. The Ninth Circuit affirmed the district court's methodology, stating that the "district court reasonably construed the loss to Cisco concerning the Terayon stock to be its inability to liquidate the stock between July 21, 1999 and March 6, 2011." Id. at 1054.

At one point the bankruptcy court acknowledged the Gordon methodology for determining damages arising from the alleged

-29-

loss of stock value as the basis of sanctions. However, at another point, the court observed that the methodology in <u>Gordon</u> was only "one methodology" and thus the court was not compelled to use it. This later statement is correct — a bankruptcy court has wide discretion in determining the nature and amount of the sanctions in contempt matters. <u>See</u> <u>United States v. Asay</u>, 614 F.2d 655, 660 (9th Cir. 1980) (citing <u>United States v. United Mine Workers</u>, 330 U.S. 258, 304 (1947)). There is thus no basis for us to remand for the purpose of mandating the application of the <u>Gordon</u> formula.

While it is true that <u>Gordon</u> did not arise in the context of contempt, the more important question LT raises on appeal is whether the bankruptcy court abused its discretion by not awarding any sanctions based on the alleged loss of the stock's value. Based on our review of the record, we determine it did not. The bankruptcy court's finding of contempt does not create an entitlement to all expenses involved in this matter.

As discussed below, the bankruptcy court properly considered whether the damages requested for the loss of stock value were appropriate as a remedial measure or whether the request in essence became a punitive damage award rather than compensatory. The bankruptcy court also properly considered whether LT's actual damages for loss of stock value were caused by ST's failure to comply with the court's orders. Therefore, the court applied the correct legal standard in determining whether the damages for loss of stock value were proper sanctions.

In particular, as the bankruptcy court observed, the

parties entered into the October 2011 Agreement which required ST to turn over the shares by December 26, 2011. The parties therefore "reset the clock" as far as damages, and any "but for" losses from the stock value would have been incurred by LT after that date. LT maintains that had he received the stock by December 26, 2011, he would have started the sales by January 10, 2012. However, the record shows that LT failed to mitigate any alleged damages by promptly seeking to retrieve or protect the value of the Axion Stock between the breach date, December 26, 2011, and February 29, 2012, when he filed the second motion for OSC. Hence, there is nothing beyond mere speculation to directly connect ST's actions with LT's inability to sell the stock starting January 10, 2012.

Moreover, the evidence in the record does not conclusively establish that LT suffered actual damages related to the alleged loss of stock value. ST's evidence showed that for sales conducted after the December 26, 2011 date, the sale price was $0.26 per share. When LT sold the stock between July 10, 2012 and July 31, 2012, he realized on average $.31 per share. Therefore, the bankruptcy court could reasonably conclude that had the shares been turned over on December 26, 2011, and promptly sold, LT would have received less from the sales than he did in July 2012. "If two views of the evidence are possible, the trial judge's choice between them cannot be clearly erroneous." In re Lehtinen, 332 B.R. at 411.

Further, the bankruptcy court balanced the alleged harm to LT against ST's gain from his delay in turning over the shares. While LT contends that this harm/gain analysis was error, it was

-31-

entirely proper when determining whether the amounts requested by LT for damages were remedial rather than punitive. At the February 13, 2013 hearing, LT's counsel pointed out that ST had actually "hurt himself by breaching the [October 2011 Agreement] because he did not have the advantage to sell." The bankruptcy court asked: "then what is the measure of the sanctions . . . I mean, just because somebody shoots themselves between the eyes, I don't think I have to sanction them."

Finally, although the Ninth Circuit has never developed a precise definition of serious punitive sanctions, given the amount requested by LT, the requested sanctions could not be considered anything but serious. As a result, the bankruptcy court could have considered LT's request for loss of value damages as punitive, especially since ST would have no subsequent opportunity to reduce or avoid the fine through compliance. In that case, the bankruptcy court may not order such monetary damages, as they are punitive and not coercive. See In re Lehtinen, 564 F.3d at 1058.

In sum, LT has not shown that the bankruptcy court erred in concluding that damages for the loss of stock value were not warranted under these circumstances.

**2. Attorney's Fees**. LT also argues that the bankruptcy court's ultimate computation of LT's costs and attorney's fees was illogical, implausible, and not supported by the record. In this regard, LT asserts that every action he took after the July 2011 Order to recover possession of the shares must be deemed compensable.

LT contends that he incurred $1,544.40 in fees relating to

-32-

the first motion for OSC. Also, to aid ST in complying with the July 2011 Order, LT entered in settlement discussions that ultimately resulted in the October 2011 Agreement, and LT incurred $29,275.33 in negotiating and drafting the agreement. By February, ST still had not complied so LT had to prepare his second motion for an OSC. LT incurred $26,286.70 in attorney's fees in seeking to enforce ST's compliance with the July 2011 Order. According to LT, it was only due to ST's willful noncompliance with the July 2011 Order that these fees could possibly accrue.

LT also argues that his attorney's fees following entry of the June 2012 Order were necessarily incurred to recover compensatory sanctions against ST. On July 24, 2012, LT filed his third motion for OSC. The court entered the order on August 17, 2012, and set a hearing on the matter for September 27, 2012. ST filed a motion to continue and the bankruptcy court heard oral argument on September 25, 2012, and continued the hearing to November 15, 2012. LT incurred $10,706.00 fees relating to these initial hearings, and subsequently LT incurred $18,926.50 in fees relating to his first and second supplemental pleadings. Therefore, LT contends that he incurred fees of $55,919.20 relating solely to obtaining the June 2012 Order and attempting to recover sanctions. LT maintains that even if the bankruptcy court took a narrow view of what constituted work directly related to the June 2012 OSC, it could not have awarded less than $26,286.70 in attorney's fees.

"Attorneys' fees frequently must be expended to bring a violation of an order to the court's attention." Perry v.

-33-

O'Donnell, 759 F.2d 702, 705 (9th Cir. 1985). In Perry, the Ninth Circuit stressed the need for flexibility in awarding fees and expenses in civil contempt actions. Id. at 705-06. The court concluded that "the trial court should have the discretion to analyze each contempt case individually and decide whether an award of fees and expenses is appropriate as a remedial measure." Id. at 705. Only those costs and fees related to the enforcement of the court's orders are authorized. In re Dyer, 322 F.3d at 1195; Flores v. Oh (In re Oh), 2008 WL 8448837, at *12 (9th Cir. BAP March 19, 2008) (noting that "two factors are considered when a court awards attorney's fees as sanctions: '(1) what expenses or costs resulted from the violation and (2) what portion of those costs was reasonable, as opposed to costs that could have been mitigated.'") (citing Eskanos & Adler, P.C. v. Roman (In re Roman), 283 B.R. 1, 12 (9th Cir. BAP 2002)).

Here, the bankruptcy court determined that the parties' October 2011 Agreement "reset the clock" as far as damages. In essence, LT's attorney's fees and costs after the July 2011 Order did not result from any violation of the court's order. Rather, LT made the decision to enter into the October 2011 Agreement instead of proceeding to enforce the court's July 2011 Order.[9]

In addition, the bankruptcy court found many of the

---

[9] Although LT filed his first motion for an OSC on October 11, 2011, the parties explained that they had reached a resolution of the matter at the October 31, 2011 hearing on the matter.

-34-

requested fees did not relate to the enforcement of the court's June 2012 Order. See In re Dyer, 322 F.3d at 1195. For example, some of the fees related to ST's failure to comply with the accounting for which the bankruptcy court did not find ST in contempt.

Furthermore, at the February 2013 hearing, counsel for ST showed that not only were the fees sought unrelated to ST's acts constituting contempt, but were also unreasonable and/or duplicative. Duplicative billings on May 29, 2012, showed $14,000 in fees incurred by four time-keepers to prepare for a hearing. The bankruptcy court took the time at the hearing to review the objected-to time entries one by one. Therefore, contrary to LT's assertion, the court's reduction of the requested fees was not arbitrary.

Finally, the bankruptcy court explained its reluctance to grant LT additional fees based on its observation that ST had already been punished by his conduct in other ways because he incurred substantial attorney's fees that would not otherwise have been necessary. This consideration was appropriate in connection with the court's exercise of its inherent sanctioning powers which must be exercised with restraint and discretion. See Chambers v. NASCO, Inc., 501 U.S. 32, 44-45 (1991).

In sum, the record demonstrates that the bankruptcy court had a legal and factual basis for reducing LT's request for attorney's fees. Moreover, as noted above, the bankruptcy court has wide discretion in determining the proper sanction depending upon the circumstances of the case, and as noted by LT's attorney at oral argument in this appeal, the bankruptcy court

was intimately familiar with this litigation as it unfolded years after debtor's plan was confirmed. Accordingly, there is no basis for us to second guess the bankruptcy court's determination regarding the sanction amount.

## VI.   CONCLUSION

For the reasons stated, having found no error of fact or law, we AFFIRM.